LOUIS KAHN ET AL. *vs.* CARL SCHOEN SILK
CORPORATION.

*Sale of Goods—Signed Memorandum—Repudiation by Seller—
Measure of Damages—Special Exception—
Time of Taking.*

A prayer by defendant that there is no evidence legally sufficient to entitle plaintiff to recover under the pleadings in this case and that therefore their verdict must be for the defendant, is insufficient, under the Act of 1914, ch. 110, as a variance prayer.                                        p. 519

Although an order for goods was not signed by the purchaser, his subsequent recognition of such order, in letters

expressing a desire to cancel it, *held* a sufficient compliance with the provision in Code, art. 83, sec. 25, as to a memorandum signed by the party to be charged.          pp. 526-528

Under Code, art. 5, sec. 9, providing that no instruction actually given shall be deemed defective because of the assumption of a fact or as submitting a question of law to the jury, unless it appear that an objection thereto for such defect "was taken at the trial," the special exception must be taken during the progress of the trial, at a time when the prayer or instruction may be amended, and cannot be considered if not taken till after the trial, though then filed by permission of court.                          pp. 528-530

The ordinary and usual rule for fixing the damages to which the seller is entitled in case of a breach of contract for the sale of goods is the difference between the contract price and the market value at the time and place for their acceptance.    p. 531

In fixing the market value as prescribed by this rule, a resale can be made to establish the market price, and if such resale results in obtaining a price above the market, the true measure of damages is the difference between the contract price and the amount realized from such resale.                          p. 531

The seller must in such case use all reasonable means to recover the best price available, and thus mitigate his damage against the buyer to that extent, and the sale must be made in good faith.                          pp. 531, 532

Code, art. 83, sec. 85, subsec. 4, providing that if labor or expense are necessary to enable the seller to fulfill his obligations under the contract, the buyer, wrongfully refusing to accept the goods, shall be liable for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract after receiving notice of the buyer's repudiation, did not apply in the case of a sale of silk to be woven into various designs and colors, it being necessary, when the process of manufacture was begun by putting the raw material on the looms, to complete its manufacture in that operation.
                          pp. 532, 533

In an action on account of the buyer's refusal to accept silk goods, to be manufactured for him in various designs and colors, *held* that his liability in damages was the difference

between the contract price and the resale price, this latter being greater than the market price at that time.    pp. 531, 533

*Decided February 28th, 1925.*

Appeal from the Superior Court of Baltimore City (STUMP, J.).

Action by the Carl Schoen Silk Corporation against Louis Kahn and Joseph Silverman, trading as the Resisto Manufacturing Company. From a judgment for plaintiff, defendants appeal. Affirmed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Jacob S. New* and *Julius H. Wyman,* for the appellants.

*Malcolm H. Lauchheimer* and *Michael Miller,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

This appeal is from a judgment obtained in the Superior Court of Baltimore City by the appellee (plaintiff below) against the appellant (defendant below) for the sum of $1701.15. The declaration is in assumpsit and sought to recover the difference between the contract price of merchandise sold by the appellee to the appellant and the re-sale price of the same merchandise when sold after the appellant had refused to accept delivery. The record contains twenty exceptions, nineteen to the rulings on evidence and the twentieth to the ruling on the prayers. At the close of the testimony in the case there were seven prayers offered by the plaintiff and two by the defendant. The court rejected all of the offered prayers with the exception of the plaintiff's fourth prayer, which was granted after modification by the court. One of the prayers offered by the defendant, designated in the record as defendant's third prayer, is a general

demurrer to the evidence, asking the court to instruct the
jury that there is no evidence in the case legally sufficient to
entitle the plaintiff to recover and their verdict must be for
the defendant. The other prayer offered by the defendant
is as follows: "The defendant prays the court to instruct
the jury that there has been offered no evidence in this case
legally sufficient to entitle the plaintiff to recover under the
pleadings in this case and therefore their verdict should be
for the defendant." This Court has been called upon in
many recent cases to pass upon prayers of similar form to
the defendant's fourth prayer, and the result of our decisions
in those cases is that where the prayer is intended as a vari-
ance prayer it is properly rejected because it does not com-
ply with the provisions of the Act of 1914, chapter 110, now
codified as section 9-A of article 5 of the Code of Public
General Laws, decisions to this effect being found in a
number of cases, beginning with *Western Union Telegraph*
*Co. v. Bloede,* 127 Md. 344, down to and including *Cal-*
*trider v. Weant* (147 Md. 338), being No. 44 of the
present term of this Court, in which last case the preceding
cases deciding this question are collected and cited. It is
evident in the present case that this fourth prayer was
intended to be a variance prayer, for the reason that the
defendant's third prayer is a general demurrer prayer and
the defendant accomplishes by that prayer everything which
he could accomplish by his fourth prayer, unless it was in-
tended as a variance prayer, and as stated, if it was so
intended, it was properly rejected. What was said in this
respect by the Court, speaking through Judge Offutt in the
case of *Balto. & O. R. R. Co. v. Walsh,* 142 Md. 230, is
directly applicable to the present case. The plaintiff's fourth
prayer, which was granted as modified by the court, is an
instruction as to the measure of damages. The exception
taken to the ruling on the prayers, therefore, presents two
questions for our determination: First, was there any leg-
ally sufficient evidence in the whole case entitling the plain-
tiff to recover; and, second, if the plaintiff is entitled to

recover, does the plaintiff's fourth prayer, as modified by the court, state the correct rule as to the measure of damages? The denial of the plaintiff's right to recover is based upon the theory that section 25 of article 83 of the Code of Public General Laws, which is a provision contained in the Uniform Sales Act, and which is substantially a re-enactment of the provisions of the statute of frauds relating to the sale of personal property of the value of fifty dollars and over, prevents a recovery in this case, in that the provisions of the statute have not been complied with. The provisions of section 25 of article 83 are as follows:

"A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upward shall not be enforceable by action, unless the buyer shall accept part of the goods or choses in action so contracted to be sold, or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf. (2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time, or may not at the time of such contract or sale be actually made, procured or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply."

The answer to this contention, by the appellee, is that, the goods in question having been manufactured by the appellee (the seller thereof) especially for the appellant (the buyer thereof) and not being suitable for sale to others in the ordinary course of the appellee's business, the provisions of the statute quoted do not apply; and, second, that if

the statute does apply, its requirements have been met. There is no question, in this case, that nothing was given in earnest to bind the contract and that the delivery of the merchandise was not accepted by the buyer, but it is contended by the appellee that there has been such note or memorandum in writing of the contract of sale, signed by the party to be charged, as constitutes a compliance with the statutory requirement. In order to determine these questions we must examine the evidence as disclosed by the record.

The appellee is a manufacturer of silk dress goods for ladies' wear, silk shadings and men's neckwear silk, with factories located in Pennsylvania, New Jersey and Rhode Island and sales rooms at 260 Fourth Avenue, New York City. The appellant is a firm located in Baltimore City, Maryland, engaged in the manufacture and sale of silk neckwear. In the latter part of February or early in March, 1920, Jack Gold, an employee and salesman of the appellee, called at the appellant's place of business in Baltimore and exhibited samples or "swatches" of silk, with the purpose of selling to the appellant silk from which the appellant would manufacture ties for sale to its trade, and that the appellant might select the various patterns, designating the same and the quantity of each pattern so selected. As a result of the conversation between the salesman and the appellant and the conclusion then reached by them, an order was made out and reduced to writing by the salesman, which contained the name and address of the appellee as being the seller, the date, March 11, 1920, the name and address of the appellant, "Terms, as before," "Order No. 6175," "Delivery, goods f. o. b. New York: May, June, July 20," "Credit and delivery of goods subject to approval of Peierls, Buhler & Co., to whom all bills are payable"; and then followed twenty-two sets of numbers representing the design or pattern of silk ordered, with the number of yards set opposite each pattern and the price per yard opposite the number of yards. The salesman, Gold, then took this memorandum and

turned it in to the general manager of the appellee in regular course. The appellee, by its general manager, examined the order, and after determining that the appellee could make delivery of the merchandise mentioned in the order at the time specified therein, mailed a copy thereof, initialed by him, to the appellant, which copy was produced at the trial by the defendants and forms a part of the record. Subsequently the following correspondence took place between the appellee and appellant:

"April 30, 1920.

"The Resisto Mfg. Co.,
  "37 S. Hanover St.,
    "Baltimore, Md.
"Gentlemen:

"It being our desire to assist our customers as much as possible, we would suggest that you accept samples on the goods you have coming from us for fall, so that you may be able to get out your salesmen's lines on time, instead of waiting for the goods to be delivered. These samples could either be additional or deducted from your order, whichever you may see fit to do. We would prefer to deduct the yardage from the goods we have to deliver.

"A few of our accounts have suggested accepting one five-yard sample of each range, which would be sufficient for them to show to their trade.

"Kindly let us know by return mail what you think of our suggestion, and also what samples you would want in case you would need any samples for your salesmen's lines.

                    "Very truly yours,
                        "Carl Schoen Silk Corporation."
"WS:O."

                                        "May 4th, 1920.
"Carl Schoen Silk Corp.,
  "Fourth Ave. at 21st St.,
    "New York, N. Y.
                Attention: Mr. Schwab.
"Dear Sir:
  "Yours of the 30th ult. regarding sample lengths;

we were delayed in answering same sooner, and it was under consideration until today. We appreciate very much your good faith regarding sample lengths, but we wish to state, however, that to our great sorrow, that according to reports that we get from our salesmen on the road, that our trade is not interested in higher priced goods. The highest priced goods that we can sell is up to $16.50 per dozen, and for this price merchandise we cannot use goods higher than $3.50 per yard. Therefore, we would consider it a favor if you will cancel the order we have with you above $3.50 per yard. If you have any cheaper class of goods, we no doubt would be interested in same, and will gladly buy from you at any time samples would be submitted to us. As you know well, the high cost of labor and the high cost of trimmings and everything attached to the manufacturing of the scarf, we cannot afford to put in any higher price goods in $16.50 scarf per dozen, than $3.50 goods.

"We hope you will appreciate the fact of the well meaning of the above. Thanking you for past favors, we beg to remain,

                    "Respectfully yours,
                        "Resisto Manufacturing Company.
"HC.CS."

                                    "May 5th, 1920.
"The Resisto Mfg. Co.,
    "37 So. Hanover St.,
        "Baltimore, Md.
"Gentlemen:

"Your favor of May 4 to hand, requesting us to cancel all goods above $3.50 per yard, and in reply beg to say that it is impossible for us to accede to your request. These goods are all in process of manufacture. We have purchased the raw material for same, and have accepted your order in good faith.

"In looking up your order, I find that you have very short lengths ordered above $3.50 per yard. They are only 6x5 yards, and to a concern like yours, J feel sure you will find ready sale for these short lengths. In fact I remarked to Mr. Gold that you

would find it necessary to duplicate these numbers, as they are all very beautiful and desirable patterns.

"We believe that we have been more than considerate in the past few weeks with your account, and have showed you our intention to meet you more than halfway.

"In regard to your fall order, we cannot accept your cancellation, and have no doubt that if you reconsider this matter you will find good use for the merchandise you have coming from us.

"Very truly yours,

"Carl Schoen Silk Corporation.

"WS:O"

"May 7, 1920.

"Carl Schoen Silk Corp.,

  "Fourth Ave., at 21st St.,

    "New York, N. Y.

"Attention: Mr. W. Schwab.

"Gentlemen:

"Your letter of the 5th to hand, and we are very much surprised at the tone of your letter. You know well enough that we will not pay $5.50 per yard for silks and sell same for $16.50 per dozen, which was explained to you in our previous letter. Therefore, we are compelled to cancel our entire order with you. We will not accept one yard of goods from you; therefore, you need not send any merchandise, as we will positively refuse to accept same.

"Yours very truly,

"Resisto Manufacturing Company.

"LK.CS."

"May 13th, 1920.

"Resisto Mfg. Co.,

  "37 So. Hanover St.,

    "Baltimore, Md.

"Gentlemen:

"We have your letter of May 7 to hand, and also a notice from the American Railway Express Company that you have refused our shipment of the 5th inst. Unless we receive an answer from you by return mail that it is your intention to accept these goods,

we shall take this matter up with the Board of Governors of the American Tie Silk Association for their action.

"We took your order in good faith, and the goods will be delivered on time, and we see no reason at all for your cancelling your order with us.

"Awaiting your prompt reply, we remain,

"Very truly yours,

"Carl Schoen Silk Corporation.

"WS :O"

"P. S.—Regarding the goods which you returned to us, we have refused to accept same, and they are lying at the express company at your risk."

"Carl Schoen Silk Corp.,

"Fourth Ave. at 21st St.,

"May 18, 1920.

"New York, N. Y.

"Attention: Mr. Schwab.

"Gentlemen:

"Yours of the 13th instant noted, and in reply to same, as previously written you, we found that we could not possibly sell ties above $16.50 per dozen, and we would not have any outlet for the goods, and therefore cancelled same. We think you appreciate and realize our position, and considering present conditions we cannot possibly use them.

"Yours very truly,

"Resisto Manufacturing Company.

"JS.CS."

"May 20, 1920.

"Resisto Mfg. Co.,

"37 Hanover St.,

"Baltimore, Md.

"Gentlemen:

"Your favor of May 18 to hand, and in reply beg to say that we cannot change from the position taken in our letter of May 13th.

"If it were possible for us to cancel our raw material contracts, and purchase silk at the present quotations, we would gladly reduce the prices on your

order, or cancel the goods.   We must stand by our contracts, and our customers must do the same.   For that reason we are unable to cancel your order, and in case you should refuse shipment, we shall be compelled to take this matter up with the Arbitration Board of the Tie Silk Association.

"As a suggestion on my part, I think it would be a good idea for your Mr. Kahn to come to New York and talk this matter over.   I believe a great deal more can be accomplished by a heart-to-heart talk than by writing letters.

"Very truly yours,

"Carl Schoen Silk Corporation.

"WS:O."

The record further discloses that the appellant had purchased merchandise from the appellee for a number of years previous to 1920.   It is not denied by the appellant that the correspondence between the parties had reference to the goods mentioned in the order taken by the salesman in February or March, 1920, and produced by the appellant at the trial.   While the appellant did not sign the order for these goods, a reading of this correspondence indicates that the appellant recognized that the order had been given by them to the appellee, and, in their letter under date of May 4th they say:   "We would consider it a favor if you will cancel the order we have with you above $3.50 per yard"; and again, in their letter of May 7, 1920, they say:   "We are compelled to cancel our entire order with you."   We think that this correspondence constitutes a compliance with the provisions of the state requiring a memorandum in writing signed by the party to be charged.   By these letters they clearly and unequivocally recognize that an order had been given by them, as indicated by the expression above quoted in which they first ask the favor of cancelling a part of the order and then later state that they are compelled to cancel the entire order.   *Drury v. Young,* 58 Md. 546.

If it be contended that there might have been more than one order to which the correspondence could have referred,

it is clear that it referred to the order taken in February or March, 1920, because, as shown by that order, there were goods purchased for a larger price than $3.50 per yard, and also goods at that price and under, and the record discloses no other order to which these letters could refer. In *Nelson v. Willey,* 97 Md., at page 381, we said: "The Court will not presume the existence of more than one agreement but will call on defendant to furnish proof that there was some other agreement to which the bond did or might refer." As authority for this proposition the Court quoted *Taylor's Law of Evidence,* and the case of *Cave v. Hastings,* L. R. 7 Q. B. Div. 128, in which last quoted case Lord Denman, C. J., said: "The cases on this subject are not at first sight uniform, but on examination it will be found that they establish this principle, that when a contract in writing or note exists which binds one party, any subsequent note in writing signed by the other is sufficient to bind him, provided it either contains in itself the terms of the contract or refers to any writing which contains them." In *Nelson v. Willey, supra,* this Court then goes on to add: "And upon the same authority parol testimony was properly admissible to identify the agreement referred to in the bond as the same offered in evidence." In 27 *C. J.* 384, sec. 477, after first stating: "As a general rule, when the memorandum consists of two or more writings, parol evidence is inadmissible to connect them." it says: "The rule has no application where the party sought to be charged voluntarily gives parol evidence which serves to connect the writings and which when connected evinces the contract. Where there is a clear reference in one of such writings to the other, parol evidence is admissible to identify the writing referred to."

We have no doubt that the writing represented by letters passing between the parties to this suit referred, and only referred, to the order for the goods for which the appellee is seeking recovery, not only because the appellant's evidence admits such to be the fact, but for the further reason that the letters themselves indicate that they refer to these iden-

tical goods. We therefore hold that there was a compliance with the requirements of the statute as to a memorandum in writing signed by the party sought to be charged, and there was no error committed by the lower court in rejecting the defendant's third prayer. Having reached this conclusion, it is unnecessary to decide whether or not the goods in question were to be manufactured by the seller especially for the buyer and were not suitable for sale to others in the ordinary course of the seller's business.

The next question to be considered is the correctness of the lower court's ruling in granting the appellee's fourth prayer as modified by the court, and which instructed the jury as to the measure of damages. This prayer instructed the jury: "That if they find for the plaintiff, the measure of damages is the difference between the contract price of the merchandise in question and the resale price of said goods, with interest, in their discretion, from the date of resale, provided however, the jury find that the resale was made by plaintiff in good faith." To this prayer the appellant filed special exceptions in the following form: "The defendants specially except to the granting of the plaintiff's fourth prayer, because there is no evidence in the case legally sufficient to show the measure of damages and the resale price, and because it assumes that a resale was made, and further because there is no evidence in the case legally sufficient to show a resale in good faith." These special exceptions were overruled by the lower court and are included in the twentieth bill of exception. The appellee contends that these special exceptions to its fourth prayer cannot be considered in this Court for the reason that they do not comply with the provisions of section 9, article 5, Code of Public General Laws. This statutory provision is: "No instruction actually given shall be deemed to be defective by reason of any assumption therein of any fact by the said court, or because of a question of law having been thereby submitted to the jury, unless it appear from the record that an objection thereto for such defect was taken at the trial; nor shall any

question arise in the Court of Appeals as to the insufficiency of evidence to support any instruction actually granted unless it appear that such question was distinctly made to and decided by the court below."

In the record, just prior to the defendant's special exceptions, we find this note: "The court granted permission to both sides to file written special exceptions after the conclusion of the trial and in accordance with that permission the defendants filed a special exception to the granting of the plaintiff's fourth prayer as modified, which is as follows": then follows the special exception as above set out. The effect of this note contained in the record is to show that the special exceptions were not taken during the progress of the trial at the time the plaintiff's fourth prayer was granted, but were filed under leave of the court after the conclusion of the trial. We think that this practice should not be allowed, for the reason that to permit it would, in large measure, nullify the remedial purpose of the statute and certainly leave existent one of the evils which the statute was intended to cure. One of the grounds of the special exception is that the plaintiff's fourth prayer assumes the fact of a resale. It is apparent from the language of the prayer that it does assume that fact, but if objection had been seasonably made by special exception pointing out that error, it could easily and in all probability would have been corrected by such an amendment of the prayer as would have left to the jury to find that there had been a resale. It is evident from the record, however, that the objection to the prayer on this special ground was not presented to the court for its action thereon until after the conclusion of the trial, and at that time there was no opportunity for an amendment to the prayer correcting the error contained therein which was complained of. We think that the language of the statute, as well as its purpose, requires that in such cases special exceptions must be taken during the progress of the trial and at such time as would give the opposite party opportunity to cure the defect complained of by seasonable

amendment. The words of the statute "was taken at the trial" could not reasonably be given any other construction, if the purpose and intent of the statute, as well as the plain language, is to be given effect. *Morrison v. Hammond's Lessee,* 27 Md. 604, at 616-618; 2 *Poe's Pl. & Pr.,* page 312, secs. 299 and 299A; *Ballimore v. Poultney,* 25 Md. 18; *Albert v. State,* 66 Md. 325; *Moses v. Allen,* 91 Md. 43.

Under the above quoted authorities and others too numerous to set out in detail, this Court has held that, in order to take advantage of an error contained in a granted prayer on the ground that it assumes the existence of a fact, or because of a question of law having been thereby submitted to the jury, or the insufficiency of evidence to support any instruction actually granted, special exceptions thereto must be taken at the trial; and we think the undoubted meaning of the statute and the result of these decisions is that "at the trial" must of necessity mean during the progress of the trial at a time when the prayer or instruction might be amended. It therefore follows that we are not at liberty to consider upon this appeal the questions raised by the appellant's special exceptions to the granting of the plaintiff's fourth prayer. What we have here said has no reference to cases where special exceptions to the granting of a prayer are made orally, at the time the prayer is offered, and the same special exceptions later, by leave of the trial court, are reduced to writing.

The Uniform Sales Act, art. 83, sec. 85, provides:

"(1) When the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance. (2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of the contract. (3) Where there is an available market for the goods in question, the measure of damages is, in the absence of special circumstances showing approximate damage of a greater amount, the difference between the contract price and the market or cur-

rent price at the time or times when the goods ought
to have been accepted; or, if no time was fixed for
acceptance, then at the time of the refusal to accept.
(4) If, while labor or expense of material amount are
necessary on the part of the seller to enable him to
fulfill his obligations under the contract to sell or the
sale, the buyer repudiates the contract or the sale, or
notifies the seller to proceed no further therewith,
the buyer shall be liable to the seller for no greater
damages than the seller would have suffered if he did
nothing towards carrying out the contract or the sale
after receiving notice of the buyer's repudiation or
countermand. The profit the seller would have made
if the contract or the sale had been fully performed
shall be considered in estimating such damages."

The plaintiff's fourth prayer, which was the only one
granted by the court, herein above quoted, was based upon
the theory of the appellee, accepted by the lower court, that
the measure of damages was that prescribed by subsection
3 of section 85, article 83. If this contention be correct, the
prayer was properly granted, for it instructs the jury that
the measure of damages is the difference between the con-
tract price and the resale price, as made by the appellee
when he found that the defendant would not accept and pay
for the goods. The ordinary and usual rule for fixing the
damages to which the seller is entitled, in the case of a breach
of contract for the sale of goods, is the difference between
the contract price and the market value at the time and place
fixed for their acceptance. This is a requirement of the
statute and is also the rule universally recognized and an-
nounced by the courts in this country and in England, in-
cluding many decisions of this Court. In fixing the market
value as prescribed by this rule, a resale can be made to
establish the market price, and if such resale results in
obtaining a price above the market, then the true measure
of damages is the difference between the contract price and
the amount realized from such resale. Justice and equity
require that the seller in such a case use all reasonable

means to recover the best price available and thus mitigate his damage against the buyer to that extent, and of course requires that the sale be made in good faith. In *Rylance v. Walker Co.,* 129 Md. at page 485, this Court, speaking through Judge Thomas, said: "The established rule in this State is that where a vendee declines to take the property and pay for it the vendor has the choice of three remedies: (1) He may store or retain the property for the vendee, and sue for the contract price; (2) he may keep the goods as his own and recover the excess of the contract price over and above the market price of the goods at the time and place of delivery; or (3) he may sell them at the vendee's risk, and sue the vendee for the difference between the contract price and the price obtained at said sale. *Regester v. Regester,* 104 Md. 1; *Swartz v. Realty Co.,* 106 Md. 290; *Tyng & Co. v. Woodward,* 121 Md. 422. In *Tyng & Co. v. Woodward, supra,* Chief Judge Boyd said: 'The plaintiff could store the goods for the defendant and sue for the contract price, or it could keep the goods as its own and sue for the difference between the contract price and the market price, or it could resell them at the vendee's risk, and sue for the difference between the contract price and the resale price.' The same rule is recognized in *Williston on Sales,* sec 555; *Dustan v. McAndrew,* 44 N. Y. 72; *Ames v. Moir et al.* (Ill.), 22 N. E. 535; *Putnam v. Glidden,* 159 Mass. 47 (34 N. E. 81); *Moore v. Potter* (N. Y.), 50 N. E. 271; *Ackerman v. Rubens,* 167 N. Y. 405. These several remedies of the vendor are also provided for by the provisions of the Uniform Sales Act."

If the facts as disclosed by the record in this case show that the measure of damages is determined by subsection 3 of section 85, article 83, under the authorities above quoted, the instruction contained in the plaintiff's fourth prayer is correct. The appellant contends that the facts here present a case such as make the provisions of subsection 4, instead of subsection 3, applicable, because the goods in question were in the course of manufacture by the seller at

the time he was notified by the buyer that they would not be accepted. The facts as disclosed by the record are, that the contract was made for the delivery of goods to be manufactured by the seller and delivery made in May, June and July, 1920; that on May 4th the buyer asked permission to cancel that portion of the contract which related to certain higher priced goods, and on May 7th informed the seller that they would not accept any of the goods; that before May 13th a portion of the goods were sent to the buyer, who refused to accept them and returned them to the seller; that at the time of receiving the notice of refusal to accept any of the goods, a portion had been manufactured and the balance was in the process of manufacture, being on the looms at the seller's mills. It is difficult to perceive how the jury could have fixed the damage in this case in accordance with the rule contended for by the appellant and contained in subsection 4 of section 85. This does not present a case of manufacturing a number of articles *seriatim*, such as nails, bolts or shoes, but is the case of manufacturing a number of yards of silk by weaving the raw material into the 'various designs called for in the contract and in the various colors therein set forth, and which made it necessary, when the process of manufacture was begun by putting the raw material on the looms, to complete its manufacture in that operation. It is equally difficult to perceive how the rule for the measure of damages, as contended for by the appellant, would have resulted in his benefit. The underlying principle of damages for the breach of a contract is compensation; or, in other words, to award such a sum in money as would put the injured party in the same position as if the contract had been fully performed by the party responsible for its breach. The evidence in this case shows that the resale price of the goods, after they were completely manufactured and refused by the defendant, was greater than the market price at that time, and therefore, when the jury under the instructions of the court awarded a sum which, according to the evidence, was the difference between

the contract price and the resale price, they only allowed a sum sufficient to place the appellee in the same position as if the appellant had fully complied with his contract. This we think both the law and justice required the appellant should do.

We next come to the rulings of the court as presented by the exceptions to the evidence. There were nineteen exceptions to the rulings on evidence during the progress of the trial, but all except eight were either abandoned or not pressed by the appellants in their brief or argument, and while we have examined them they do not call for any discussion further than to say that we have found no error as to them in the court's rulings. The above applies to the first, fourth, fifth, sixth, seventh, tenth, fourteenth, fifteenth, sixteenth, seventeenth, and eighteenth. The eighth, ninth, eleventh, and nineteenth exceptions relate to rulings on evidence as to the market price of the goods at the time of the resale. We think the witnesses were competent to testify on this subject and that their evidence was material and relevant in fixing the market price, showing that the resale price was equal to or greater than the market price and that the resale was made in good faith. The second, third, twelfth and thirteenth exceptions relate to the rulings of the court on testimony tending to show the scope of the authority of the salesman, Jack Gold, which we think was properly admitted for that purpose. The testimony covered by these exceptions was largely by witnesses who were engaged in similar business and had had prior transactions of the same kind with the appellee and were fully cognizant of the scope of authority of the appellee's salesman.

Without prolonging this opinion unduly, it is sufficient to say that we have discovered no error in the rulings of the lower court on the evidence or prayers, and therefore the judgment must be affirmed.

*Judgment affirmed, with costs.*