# GEORGE F. OBRECHT *v.* FRANK E. CRAWFORD ET AL.

[No. 9, October Term, 1938.]

386

388

*Decided November 2nd, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Rignal W. Baldwin, Jr.*, with whom were *Semmes, Bowen & Semmes* on the brief, for the appellant.

*Hilary W. Gans* and *Joseph T. Brennan,* with whom were *Brown & Brune* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

G. Fred Obrecht, the appellant, trading as P. Fred Obrecht and Son, herein called the buyer, conducts a feed business in Baltimore, Maryland. Frank E. Crawford, Fred F. Keen and Alfred G. Mulcahy, trading as Crawford, Keen & Co., the appellees, called in this opinion the seller, are engaged in the business of exporting food stuffs and milling products to and from the Argentine Republic, and have their principal office in Buenos Aires and an American office in New York.

As a consequence of correspondence begun in July, 1933, Obrecht agreed to buy from the appellees five hundred tons of Argentine Feed Flour to contain one per cent fibre at twenty-six dollars per ton of 2,240 pounds c. i. f. Baltimore, for shipment on the S. S. West Selene or substitute scheduled to sail on or about December 14th,

1933, on irrevocable sight letter of credit to be opened in Buenos Aires. The buyer later agreed that the seller might divide the shipment, shipping part on the S. S. West Selene and part on the S. S. Tercero, to arrive about January 19th or 20th, about a week later than the West Selene.

The seller had the entire shipment in store at the time of delivery, and was ready, able, and willing to perform its undertaking, but the buyer, in violation of his contract, failed to open a letter of credit. The flour in that climate and at that time was perishable, and the seller then resold it in London for the account of Obrecht in six instalments over a period extending from December 18th, 1933, to February 23rd, 1934. The proceeds of the resale were $3,348.38 less than the net sales price stipulated in the contract with Obrecht, and the seller then brought this action to recover that loss. The trial resulted in a verdict for the plaintiff, and from the judgment on that verdict the defendant took this appeal.

As the case comes to this court it may be assumed that the appellees were entitled to recover, so that the only questions to be considered here are whether the jury was properly instructed as to the recoverable damages, and whether the court erred in ruling on objections to evidence affecting that question.

Evidence in the case tended to prove the facts stated in the following narrative. Argentine Feed Flour is a low grade wheat flour classified in the Argentine as "½ 0" or "one-half zero," having a lower fibre content than American Second Clear Spring Wheat Flour, a similar product, and is ordinarily used as food for cattle, poultry and dogs, either in its original state or mixed with other material in the form of prepared foods. Its low fibre content makes its classification as a food for human beings possible. If classified as unfit for human food it would be subject to a tariff of ten per cent, but if classified as fit for human food it would be subject to a much higher tax. In order to bring it within the lower classification it is necessary to build up its fibre content

so that it will be not less than one per cent of the total content of the product.

At the time of the sale Argentine Feed Flour was not generally sold in the United States, although Obrecht knew that it had been used on Long Island in New York for feeding ducks. Ordinarily in the United States Second Clear Spring Wheat Flour, a by-product of milling spring wheat, was used for purposes for which Argentine feed flour was suitable.

The evidence fails to show that there was any general market in the United States for the Argentine product, and from permissible inferences it may be assumed that there was no such market. Obrecht knew of no such market at the time of the sale and, to quote from the testimony of Frank E. Crawford, apparently in charge of appellees' New York office, so far as he knew, "there was no market in the United States in 1933 or 1934 for Argentine flour covered by the contract. Argentine flour had never been shipped before, to witness' knowledge. Now there is a very good market for it. The product is 'low grade feed flour,' or 'feed flour,' and witness' firm had not sold any of the flour in this country nor had any inquiries for it. Witness did not know of any market for Argentine low grade feed flour in this country. Witness kept in constant touch with the various markets in the United States for produce of the character of feed flour. There was no recognized market in this country on which Argentine feed flour was traded. Plaintiffs had been shipping most of this low grade Argentine feed flour to England and some to the Continent."

W. Guy Hartsock, a salesman for the Bay State Milling Company, who had been employed by the Washburn-Crosby Company for ten years, at one time as a salesman, at other times as office manager and supervisor in charge of wholesale and retail sales in the Baltimore area, said that he had no knowledge of any sales in this country of Argentine feed flour, that he knew nothing of Argentine feed flour for market use, and had never

heard of any competition from millers in the Argentine on that class of flour.

The Argentine feed flour, while similar to American Second Clear Spring Wheat Flour, is not the same thing. In its original state the Argentine flour is not unfit for use as food for human beings while the American product is, and that difference was important, for upon it depended the classification of the Argentine flour for tariff purposes. There was evidence that both products were suitable for use as food for stock and for the manufacture of prepared animal foods, but the commodity described in the contract in issue here was neither American Second Clear Spring Wheat Flour nor Argentine Feed Flour, but rather Argentine Feed Flour so treated as to bring it within the classification of food unfit for human consumption, for tariff purposes.

As stated above, the Argentine Feed Flour is perishable, and in respect to that Alfredo G. Mulcahy, a partner, residing in Buenos Aires, testified that "when letter of credit was not opened, 'the flour was shipped to England for the account of Obrecht, endeavoring to sell it at the best price, and even utilizing for this purpose previous contracts we had pending, at a price considerably over the market price, at the time of shipment.' This flour is of a perishable nature, and keeping it in store during the summer months would increase the risk of deterioration. We deemed it necessary to resell this flour for the account of Obrecht within a week after the original specified time by which we had to ship it to Obrecht, under the contract. November, December and January are summer months in Argentine. We received a request about December 8th, 1933, from our New York Office, to change the terms of shipment of this flour, so as to ship only 100 tons during December, and the balance at a later date. At that time we had made preparations to ship the full 500 tons of flour to Obrecht in Baltimore and had the whole 500 tons in store. When the letter of credit was not opened we commenced shipping the 500 tons to London for the account of Obrecht at the

best possible price obtainable in that market." On November 28th, 1933, the seller wrote the buyer that in the past practically all of the Argentine flour had "gone to England," and Crawford, who kept in "constant touch" with the markets of the United States for similar products, knew of no market here for Argentine Feed Flour, and said that there was no recognized market in the United States "on which Argentine Feed Flour was traded," but that most of it had been shipped either to England or to the "Continent."

There was an American market for American Second Clear Spring Wheat Flour, and on that market, at the time of the sale, that product brought higher prices than those fixed in the Obrecht contract, and it also appeared that in the Argentine market the price for Argentine Feed Flour had stiffened "as of November 20" for January over December to $27 per ton.

It also appeared that the price on the London market fell from $21.75 on December 18th, 1933, the date of the resale of the first instalment, to $13.50 per ton on February 23rd, 1934, the date of the resale of the last instalment.

In the course of his direct testimony, Mulcahy had testified that the seller had sold the five hundred tons to London for the "best possible price obtainable in that market." Later on he was asked this question: "I understood you to say that the resales of the flour and the shipment thereof to England for the account of Obrecht was made at the best possible price then obtainable?" An objection to that so called question was overruled, and that ruling is the subject of the first exception. In fact the witness had given no such testimony; what he had said was that he had sold in London for the best price obtainable there, not that he had sold for the best price obtainable anywhere. The question improperly assumed a fact and was leading, but no objection was made to it on that specific ground in the trial court, so that objection to it on that ground cannot be considered in this court. *Cronin v. Kimble,* 156 Md. 489, 496, 144

A. 698; *McClees v. Cohen*, 158 Md. 60, 68, 148 A. 124. The only other objection urged to the question was that it referred to the best price obtainable in the London market, when appellees had failed to show the state of the market elsewhere. That objection is apparently without point. On any possible theory of the case, the price of the product on the London market was a relevant inquiry. Assuming, as the appellant contends, that the seller would have sold the flour at the best price obtainable on the best available market, obviously its price on the London market was both relevant and material for purposes of comparison, if for no other purpose, since it was undisputed that there was a market for it in London.

In so far as anything appears from the second and third exceptions, it is that Mulcahy was asked to describe the "method or manner" of the resales in London. To that inquiry the appellant objected, but the testimony was allowed subject to exception. Later he moved in one motion to strike out "all evidence admitted subject to exception relating to the resales * * * and the damages resulting therefrom" and in another "all evidence, admitted subject to exception, relating to resales * * * in January and February, 1933, and all evidence relating to damages alleged to have resulted therefrom * * *." For the reason stated in dealing with the first exception the first motion was properly overruled, and for that reason and for the further reason that there was no evidence of any sales in January or February "1933," the ruling in respect to the second motion was also free from error.

At the close of the whole case the appellees offered four prayers, all of which were granted. The appellant offered six damage prayers, of which two were granted and the others refused. The appellant excepted to the granting of the appellees' prayers, and to the refusal of its, D, D-5, D3X and D3Y prayers.

By the appellees' fourth prayer the jury were told that "the measure of damages is the difference between the contract price of the Argentine Feed Flour mentioned in the evidence and the resale price of said Flour, with

interest, in their discretion, from the date of resale (provided, however, that the Jury find that the resale was made by the Plaintiffs in good faith), together with such sum, if any, as the Jury shall find the Plaintiffs were assumed to lose as the result of the refusal of the Defendant to purchase said Argentine Feed Flour from the Plaintiffs, through the fluctuation in foreign exchange, with interest in their discretion, from the date such loss was incurred." But they were told much the same thing by the plaintiffs' third prayer, the granting of which is not questioned in the appellant's brief, which concluded in these words "and if the Jury further find that the Plaintiffs, acting in pursuance of such custom or usage, sustained a loss in the sale and subsequent purchase of American dollars as mentioned in the evidence, then the Jury, in estimating the damages, in addition to the difference, if any, the Jury find, between the contract price and the resale price of the flour mentioned in the evidence, shall award the Plaintiffs such sum, if any, as the Jury shall find the Plaintiffs were caused to lose as a result of the refusal of the Defendant to purchase said Argentine Feed Flour from the Plaintiffs, through the fluctuation in foreign exchange mentioned in the evidence, with interest in their discretion from the date such loss was incurred." So that even if the fourth prayer had been refused, the appellant would have been no better off. But apart from that consideration, a prayer in that precise form was approved in *Kahn v. Karl Schoen Silk Corp.*, 147 Md. 516, 528, 128 A. 359, 285. The prayer approved in that case formulated a rule for measuring the damages which a seller might recover from a buyer who had in violation of a sales contract refused to accept delivery of the goods described therein, which is also the very question presented by this appeal. It is true that the words "good faith" as used in the prayer, because of their generality, carry too heavy a burden, but they are not infrequently used by courts and test writers as meaning reasonable care, diligence, and judgment, and were so accepted in the case last

cited. 147 Md. 516, 532, 128 A. 359. While it may have been better for the sake of clarity to have spelled out the meaning of the phrase, it is highly improbable that the jury could have been misled by it, and in view of the decision in *Kahn v. Karl Schoen Silk Corp.*, *supra*, no error is found in the ruling on that prayer.

Consideration of defendant's four damage prayers which were refused requires a statement of the legal principles affecting the rights and the remedies of the seller who is himself without fault against a buyer who wrongfully fails to accept the goods sold to him under a sales contract.

The contract in this case was a c. i. f. contract, under which the seller upon payment of the price fixed by the contract or performance of any other stipulated condition was obliged to deliver to the buyer a bill of lading and other necessary shipping documents, together with a satisfactory policy of insurance covering the risks of the voyage. 55 *C. J.* 487. It has been loosely described as a sale of documents rather than a sale of goods. *Karberg v. Blythe* [1915] 2 B. K. 379. Under it, when the seller delivers the goods to the carrier at the point of shipment, procures a bill of lading under which the goods will be delivered at the point of destination, effects a policy of insurance, for the benefit of the buyer, covering the risks of the voyage, and tenders the bill of lading and other shipping documents to the buyer together with the policy, he has fully performed his contract. *Ibid. Benjamin on Sales*, 811; *Ireland v. Livingston*, L. R. 5 H. L. 395, 406. Or, as stated in *Biddle Bros v. E. Clements Horst Co.* [1911] 1 K. B. 214; "the meaning of a contract of sale under cost, freight, and insurance terms is so well settled that it is unnecessary to refer to authorities upon the subject. A seller under a contract of sale containing such terms has firstly to ship at the port of shipment goods of the description contained in the contract; secondly, to procure a contract of affreightment, under which the goods will be delivered at the destination contemplated by the contract; thirdly, to

arrange for an insurance upon the terms current in the trade which will be available for the benefit of the buyer; fourthly, to make out an invoice as described by Blackburn J. in *Ireland v. Livingston* [(1872) L. R. 5 H. L. 395] or in some similar form; and finally to tender these documents to the buyer so that he may know what freight he has to pay and obtain delivery of the goods, if they arrive or recover for their loss if they are lost on the voyage. Such terms constitute an agreement that the delivery of the goods, provided they are in conformity with the contract, shall be delivery on board ship at the port of shipment. It follows that against tender of these documents, the bill of lading, invoice, and policy of insurance, which completes delivery in accordance with that agreement, the buyer must be ready and willing to pay the price."

Where the seller is ready, able, and willing to deliver the documents called for by the contract, but, through no fault of the seller, the buyer, in violation of the contract of sale, refuses or otherwise fails to tender the purchase price or other consideration, where the goods are perishable, the seller may at once resell them, and if the resale yields a price less than the contract price, he may recover the difference from the buyer. Code, art. 83, sec. 81, 1 Un. Laws Ann. sec. 60. Or even where the goods are not perishable, the seller may either sell the goods for the account of the buyer to establish a market price, or to liquidate his damages (*Kahn v. Karl Schoen Silk Corp.*, 147 Md. 516, 530, 128 A. 359), or he may maintain an action against the buyer for damages for non acceptance (Code, art. 83, sec. 85, 1 Un. Laws Ann. sec. 64), for, while the seller may re-sell, he is under no duty to do so (*Higgins v. California Prune Growers, Inc.*, 1926, 16 Fed. (2nd) 190), other than the general duty of mitigating his damages. 1 Un. Laws Ann. sec. 64, V, a, p. 349.

Where the goods are of a perishable nature the right of the seller to re-sell them is settled (Code, art. 83, sec. 81), but where he elects to re-sell, he must do within a

reasonable time and in such a manner as to secure the best obtainable price (1 Un. Laws Ann. sec. 60 IV, p. 314) and he is bound to exercise reasonable care and diligence to that end. *Ibid,* Code, art. 83, sec. 81, subsec. 5; *Tiffany on Sales* (2nd Ed.) 350, 55 *C. J.* 1055 *et seq.; Kahn v. Karl Schoen Silk Corp.*, 147 Md. 516, 530, 128 A. 359; *Williston on Sales,* secs. 546, 547; 24 *R. C. L.* 114; 42 *L. R. A.,* N. S., 682. Where there has been no re-sale and the seller elects to sue for his damages, ordinarily the measure of his recoverable loss is the difference between the contract price and the market price at the time (Code, art. 83, sec. 85) and place (*Kahn v. Karl Schoen Silk Corp., supra; International Co. v. Sun-Maid Raisin Growers,* 146 Md. 608, 616, 127 A. 393; 55 *C. J.* 1050; *Devoine Co. v. International Co.,* 151 Md. 690, 136 A. 37; *Dimmick v. Hendley,* 117 Md. 458, 84 A. 171; *Furstenburg v. Fawsett,* 61 Md. 184) where the contract should have been performed, when there is available a market there. 55 *C. J.* 1052. In such an action, to recover more than nominal damages, the burden is upon the seller to show the market price of the goods at the place and time of delivery. *Curjel & Co. v. Hallett Mfg. Co.,* 198 Ala. 609, 73 So. 938, 943; *Williston on Contracts,* 1378; *Williston on Sales,* sec. 582.

Where there has been an actual resale, the measure of damages is formally different, since there it is the difference between the lesser price realized at the resale and the contract price, if the resale was made in good faith, *Kahn v. Karl Schoen Silk Corp., supra,* page 532, 128 A. 359. A sale in good faith is a "fair sale * * * according to established business methods, with no attempt to take advantage of the vendee" (*Ackerman v. Rubens,* 167 N. Y. 405, 60 N. E. 750, 751), and the burden of proving that the sale was so made seems to be upon the seller. *Williston on Sales* sec. 547.

But whether the action is to recover damages merely, or to recover the loss resulting from a resale, its purpose is to compensate the seller for the loss he has actually suffered, which is theoretically the same in either case,

since obviously the seller could have no right to vary the measure of his damages by electing to pursue one course or the other (44 *A. L. R.*, annotation at page 216 *et seq.; Kahn v. Karl Schoen Silk Corp., supra;* 44 *A. L. R.* annotation at page 297 *et seq.*). In measuring the seller's loss resulting from a resale, the market price of the commodity at the place and time of delivery is no less vital than in an action by the seller for damages caused by the buyer's refusal to accept where there has been no sale. But where in an action to recover the loss resulting from a resale the seller proves that the resale was fair and made in good faith, the burden of persuasion shifts to the defendant to show that it was not so made. Good faith as used in that formula is a symbolic expression denoting that the seller in making it exercised reasonable care, prudence, and diligence.

Logically the place of delivery under a c. i. f. contract would seem to be at the point of shipment (*Benjamin on Sales,* 851, *Williston on Sales,* secs. 280c, 280h, 55 *C. J.* 487), unless a different intention is manifested. So, in the absence of evidence of a definite intention to the contrary it may be assumed that the place of shipment is also the place of delivery, since from that point title would be in the buyer and the shipment at his risk. It would follow therefore that the goods should have been sold in Buenos Aires, since they were physically present there, and since delivery was to be made there, if there was a market for them in that city. But while the seller is ordinarily required to sell at the time and place of delivery, the requirement is not so rigid as to exclude all discretion, and where it seems probable that they can be sold to better advantage in some other place, a sale there is not necessarily inconsistent with good faith. *United States v. Swift & Co.,* 270 U. S. 124, 46 S. Ct. 308, 70 L. Ed. 497, 517. In a note to the case last cited (70 L. Ed. 497), it is said that where the seller resells to fix his damage it is his duty to resell where the goods are at the time of the breach, if there is an available market there. But if there is no ready market at the place of delivery the seller may sell at another place.

70 L. Ed. 500. And it has been held that where the resale is at a place other than the place of delivery, the burden is upon the seller to show that there was no home market, and that the place of resale was the nearest available market, and in *Swift & Co. v. United States,* 59 Ct. Cl. 364, it was held that in making a resale at a place other than the place of delivery, in the absence of a showing that there was no adequate market at the place of delivery, the seller assumes the risk that the sale will be beneficial to the buyer (see 70 L. Ed. 503), although those conclusions are contrary to the conclusion, announced in the opinion in *United States v. Swift & Co.,* 270 U. S. 124, 150, 46 S. Ct. 308, 317, 70 L. Ed. 497, 517, that a sale in a foreign market made in the honest exercise of a reasonable discretion may be entirely consistent with good faith even though there was no showing that the home market had been exhausted.

Turning to the appellant's prayers with these principles in mind, no error is apparent in their refusal. His D prayer is a peremptory instruction to the jury that they might only allow the appellee nominal damages. It was based upon a conclusive presumption that the sales made by the appellee were made in bad faith. No such presumption is permitted by the record in view of the uncontradicted testimony of Mulcahy that the flour was shipped to England "endeavoring to sell it at the best price, and even utilizing for this purpose previous contracts we had pending, at a price considerably over the market price, at the time of shipment," and that because of the perishable nature of the goods it was deemed best to resell it "within a week" after the "specified time," and that part of the shipment was sold at fully 20% over the highest market price on the day of shipment.

Appellant by his D-5 prayer asked the court to instruct the jury that if they found that "from the evidence that the net market price prevailing at New York City, Baltimore or Minneapolis at the time of breach and of resale was equal to or greater than the contract price and that the Plaintiffs could reasonably have known of such market price but nevertheless sold the flour in London at a

price below the contract price, then the Plaintiffs are entitled to nominal damages only." There are two objections to the prayer, both vital. One that there was no evidence in the case of any market in any of the cities named for Argentine Feed Flour, although there was a market in them for American Second Spring Wheat Flour, which is a different thing. The other is that the diligence which the appellees were bound to exert in their search for a market did not necessarily require them to investigate all the possible places where their product might be sold.

One vice of appellant's D3X prayer is that it ignores the fact that the seller made an actual resale of the flour, and it is applicable rather to a case in which the seller sues for damages resulting from the buyer's refusal to accept goods which have not been resold.

It announced that "any damages allowed in connection with the feed flour must be measured by the difference between the contract price and the average fair market value of the feed flour during the latter part of December, 1933, at Buenos Aires and further that the burden of proof is on the Plaintiff to prove the fair market value at said time and place by a fair preponderance of affirmative evidence," and would have instructed the jury that unless plaintiffs met that burden they were only entitled to nominal damages. The prayer was bad for several reasons. First, it assumed a fact, to wit, that there was a market in Buenos Aires for the goods and that the price in that market conclusively determined the amount of damages which the plaintiff might recover, whereas if there was a market there the price obtainable in it was not conclusive evidence of good or bad faith on the part of the plaintiffs in making the resale, but only a factor to be considered in dealing with that issue. Second, it in effect told the jury that unless there was a market in Buenos Aires, the plaintiff could recover only nominal damages. Finally it ignored the possibility that even though there was a market in Buenos Aires, there may have been a better market elsewhere.

Appellant's D3Y prayer would have instructed the jury that "any damages allowed in connection with the feed flour must be measured by the difference between the contract price and the fair market value of the feed flour on December 14th, 1933, at Buenos Aires and further that the burden of proof is on the Plaintiff to prove the fair market value at said time and place by a fair preponderance of affirmative evidence, and not by the amount received upon the actual resales in London; and the Jury are further instructed that the evidence as to the amount received upon resales in London and with respect to the fair market value of American feed flour of the same character and suited for the same uses during December, 1933, and January and February, 1934, may be considered by them only as reflecting on the fair market value, of the feed flour on December 14th at Buenos Aires." That instruction also assumes that there was a market for the goods in Buenos Aires, and improperly makes the price in that market an exclusive test of plaintiff's good faith in making the resale. Moreover it permitted the jury to determine the fair market value of plaintiffs' product by considering the fair market price of another and different product not in Buenos Aires but anywhere, and it ignored plaintiffs' evidence which permitted the inference that the resale was at the best market obtainable anywhere.

It is true that American Second Spring Wheat Flour may be used for the same purposes as Argentine Feed Flour, just as coal may be used for the same purposes as fuel oil, but they are not the same. Unless changed by the addition of other ingredients the Argentine product may be classified as fit for human food, while the American product may not be so classified. For these reasons that prayer was also properly refused.

Finding no error in the rulings of the trial court the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*