674 A.2d 35

**Norris PYLES, et al.**

v.

**Herbert GOLLER.**

**No. 917, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 29, 1996.

72

Walter W. Sawyer, III (Sawyer & Myerberg, P.A. on the brief), Lexington Park, for appellants.

Michael S. Rosier of Oxon Hill, for appellee.

Argued before WENNER, FISCHER, and HOLLANDER, JJ.

FISCHER, Judge.

Mr. Norris Pyles and Mr. Charles Dudley Reed (Pyles and Reed collectively) appeal from an order of the Circuit Court for St. Mary's County (Briscoe, J.) that directed Pyles and Reed to convey a plot of land to Dr. Herbert Goller (Goller). Goller sued Pyles and Reed for specific performance and damages for fraud relating to an auction of real estate owned by Pyles and Reed. Upon a motion by Goller, the circuit court severed the two claims and conducted a bench trial on the specific performance count. After the circuit court ordered specific performance for Goller, it granted Goller's motion to dismiss the remaining fraud count.[1] Pyles and Reed present the following issue for our review, which has been reworded, clarified, and condensed:

---

1. The auctioneer, William Fitzgerald, was a defendant in the fraud claim. Because the fraud count was dismissed, he is not a party to this appeal.

I. Did the circuit court err by granting Goller's claim for specific performance for the sale of land between Goller and Pyles and Reed?

## FACTS

Pyles and Reed owned a plot of land in St. Mary's County, known as Parlett Farm West (Parlett), as tenants in common. In 1990, they contracted with William Fitzgerald (Fitzgerald), of W.J. Fitzgerald Auctioneers & Co., to sell eleven lots of the Parlett property at public auction.[2]

---

2. The following definitions and explanations are taken from the National-al Auctioneers Association Glossary of Terms. We include these definitions in order to introduce some of the terms of art associated with auctions.

**Auction**
A method of selling real estate in a public forum through open and competitive bidding. Also referred to as: public auction, auction sale or sale.

**Absolute Auction**
An auction where the property is sold to the highest qualified bidder with no limiting conditions or amount. The seller may not bid personally or through an agent. Also known as an auction without reserve.

**Auction With Reserve**
An auction in which the seller or his agent reserves the right to accept or decline any and all bids. A minimum acceptable price may or may not be disclosed and the seller reserves the right to accept or deny any bid within a specified time.

**Auction Without Reserve**
See Absolute Auction.

**Bidder's Choice**
A method of sale whereby the successful high bidder wins the right to choose a property or properties from a grouping of similar or like-kind properties. After the high bidder's selection, the property is deleted from the group, and the second round of bidding commences, with the high bidder in round two choosing a property, which is then deleted from the group and so on, until all properties are sold.

**Hammer Price**
Price established by the last bidder and acknowledged by the auctioneer before dropping the hammer or gavel. [Also known as when the "hammer falls."]

**Minimum Bid Auction**
An auction in which the auctioneer will accept bids at or above a disclosed price. The minimum price is always stated in the brochure and advertisements and is announced at the auctions.

Fitzgerald advertised the auction in the *Washington Post.* The advertisement: (1) stated that the auction would be an "Absolute Auction" and there would be "No Minimums;" (2) stated that the auction would be held on October 27, 1990; and (3) contained a description of the property and the terms of the sale. An advertisement in an issue of "Homes and Land of Southern Maryland" contained much of the same information as the *Washington Post* advertisement, except that it included that only two of the lots would be sold "without reserve."

A pamphlet prepared by Fitzgerald, and sent to Goller, announced that the action would be held by the "High Bidder's Choice Method." The pamphlet stated that:

[A] High Bidder Choice Method means the successful bidder has there [sic] choice of any one of the properties being offered. That Parcel is set aside and the properties that are remaining will be the one offered in the same manner until no properties are left.

The pamphlet also included the following terms and procedures with respect to the auction:

A cashier's check or certified check in the amount of $5,000 will be required in order to bid for each lot you intend to buy.

.    .    .    .    .

*Term of Sale:* At time and place of sale, the purchaser will be required to make a deposit of $5,000 for each lot purchased, payable in cash or certified check. . . .

.    .    .    .    .

*Two Lots* to be determined at the time and place of auction will be sold absolute to the highest bidder, regardless of price. No minimums, no reserves.

---

National Auctioneers Association, *Glossary of Real Estate Auction Terms* 2–4.

The legal significance of some of these terms is discussed more thoroughly in this opinion.

The final high bid on all remaining lots will be irrevocable by the buyer and subject to confirmation by the seller within 48 hours....

It is unclear from the record how strictly Fitzgerald adhered to the registration procedures for the auction. The printed materials required a $5,000 deposit in order to bid on a lot. Under this procedure, once the $5,000 check was filed with or verified by Fitzgerald, he would give the bidder a bidder's card, which would enable a person to bid at the auction. During direct examination, however, Fitzgerald testified that the $5,000 check was not a requirement to get on the buyer's registration list.

On October 27, 1990, the day of the auction, only two people registered for the auction; Goller and an unknown bidder. Prior to the start of the auction, Pyles and Reed told Fitzgerald that they were considering bidding on the lots. Fitzgerald testified that he had reservations about letting Pyles and Reed bid on the property, because it was his understanding that "[at] an absolute auction, the owner does not have the ability to bid on his own property."

Fitzgerald testified that he relayed this information to Goller during a private conversation. Goller, in turn, testified that Fitzgerald told him "that I think that the owners are going to bid on it [the property]."

Before starting the auction, Fitzgerald made, in part, the following announcement to the participants:

We will have high bidder's choice today. That is where the high bidder wins the right to choose a lot. After the high bidder picks, the lot is set aside and a second round of bidding starts with a high bidder in this round choosing a lot. This is then set aside and so on until all lots are sold. The owner will then choose, within 48 hours, the lot to be sold absolute....

At no time did Fitzgerald announce that Pyles and Reed were going to bid on the Parlett lots.

Fitzgerald started the auction and Goller was the highest and only bidder during the first round. He bid $25,000 and selected lot No. 7. Mr. Pyles was the highest bidder in the second round with a bid of $26,000, and selected lot No. 9. Mr. Reed was the highest bidder in the third round, with a sum of $26,000. He selected lot No. 12. Both Pyles and Reed bid even though they did not present a $5,000 cashier's check to Fitzgerald. The unknown party was the highest bidder in the fourth round with a bid of $25,000, and he selected lot No. 4. The auction ended after the fourth round.[3]

At the conclusion of the auction, Pyles and Reed informed Fitzgerald that they were going to accept their two bids on lots No. 9 and No. 12. They rejected Goller's bid on lot No. 7. At trial, Mr. Pyles testified that one of the reasons Pyles and Reed did not accept Goller's bid was that the bid did not equal what Pyles and Reed owed on the lot.

After Fitzgerald informed Goller that his bid was rejected, Goller asked the identity of the "new" owners of the two lots. Fitzgerald informed Goller that Pyles and Reed bought the two lots. Goller became very upset because he was under the impression that the owners were not allowed to bid. After Goller left, Pyles and Reed paid their $5,000 deposit, and eventually executed their contracts of sale, went to settlement, and paid Fitzgerald his commission.[4]

---

3. The record contains the following information with respect to the lots involved in this auction:

|  | size | original price | suggested opening bid | actual bid |
|---|---|---|---|---|
| lot 4 | 7.11 acres | $85,000 | $60,000 | $25,000 |
| lot 7 | 19.96 acres | $99,950 | $85,000 | $25,000 |
| lot 9 | 17.86 acres | $85,500 | $80,000 | $26,000 |
| lot 12 | 16.80 acres | $85,500 | $67,000 | $26,000 |

4. The record indicates that after Mr. Pyles recorded the deed for his land, he built a house on his lot, which he eventually sold. Mr. Reed, after recording his deed, sold the lot.

Following his rebuff at the auction, Goller filed suit in the circuit court for specific performance and damages for fraud relating to the auction. After a motion for a jury trial, the circuit court severed the two claims. The specific performance claim, because it was based in equity, was tried before the trial judge.

After the testimony, the circuit court ordered Pyles and Reed to convey lot No. 7 to Goller. Following the order for specific performance, the trial judge granted Goller's motion to dismiss the fraud claim. Pyles and Reed filed this timely appeal to contest the order for specific performance.

## DISCUSSION

This case requires us to examine several aspects of contract law, previously not clarified by this Court or the Court of Appeals. The law related to sale of property at an auction is a legal anomaly. Various treatises describe the controlling legal principles at length and are, for the most part, in harmony. Little of this law, however, has made its way into the case law. Many state and federal courts, therefore, have relied on the treatises' persuasive authority for auction questions. *E.g., Nicholson v. Clark,* 802 S.W.2d 934 (Ky.Ct.App.1990), *cert. denied,* 802 S.W.2d 934 (Ky.1991) (relying on Restatement (Second) *Contracts, Corbin on Contracts,* and 7 Am.Jur.2d *Auction and Auctioneers* for authority on the procedures and rules of an auction); *Golfinopoulos v. Padulo,* 218 N.J.Super. 38, 526 A.2d 1107 (App.Div.), *cert. denied,* 109 N.J. 45, 46, 532 A.2d 1112 (1987) (relying on Restatement (Second) *Contracts and Corbin on Contracts* because there was no case law detailing the terms and procedures of a "without reserve" auction); *S.S.I. Investors Ltd. v. Korea Tungsten Mining Co.,* 80 A.D.2d 155, 438 N.Y.S.2d 96 (1981), *aff'g,* 55 N.Y.2d 934, 449 N.Y.S.2d 173, 434 N.E.2d 242 (1982) (relying on *Corbin on Contracts* to establish when an offer and acceptance occur at

an auction).[5]

Treatises serve as important tools for outlining established principles, especially in contract law. This Court and the Court of Appeals frequently cite to treatises for persuasive authority on contract issues. *E.g., Chernick v. Chernick,* 327 Md. 470, 479, 610 A.2d 770 (1992) (quoting Restatement (Second) § 224 to define "consideration"); *Ferrero Constr. v. Dennis Rourke Corp.,* 311 Md. 560, 536 A.2d 1137 (1988) (citing, *inter alia,* Restatement (Second) § 26 to establish when a valid "offer" occurs); *Maryland Supreme Corp. v. Blake Co.,* 279 Md. 531, 369 A.2d 1017 (1977) (quoting 17 Am.Jur.2d *Contracts* § 34 (1964) to define an "offer" because the UCC does not define the term itself); *Rofra, Inc. v. Bd. of Educ.,* 28 Md.App. 538, 540, 346 A.2d 458 (1975), *affirmed,* 278 Md. 102, 358 A.2d 562 (1976) (quoting *Williston on Contracts* § 31 (3rd ed. 1959) to establish when a bid constitutes an offer).

Our central consideration in this case focuses on whether Pyles and Reed, as co-owners of Parlett as tenants in common, had the legal authority to bid on the property. This issue breaks down into two distinct components: (1) whether an owner of land as a tenant in common can bid on property sold at an auction held "without reserve;" and (2) whether there was sufficient notice to constitute a modification of the auction's terms as described in the advertisement and pamphlet. The final issue involves whether the statute of frauds bars Goller's recovery in this case.

## I.

Pyles and Reed argue that if the auction was held "without reserve," they were still allowed to bid as individuals because they were partners and owned Parlett as tenants in common. Goller counters that owners, including joint owners, are pro-

---

5.   Unless otherwise specified, all treatise references are from Restatement (Second) *Contracts* § 1 *et seq.* (1981), 1 Arthur L. Corbin, *Corbin on Contracts* § 1 *et seq.* (Rev. ed. 1993), or 7 Am.Jur.2d *Auction and Auctioneers* § 1 *et seq.* (1980).

hibited from bidding on their own property at an auction held "without reserve."

## A.

A contract is a promise enforceable at law. *E.g.*, Restatement (Second) *Contracts* § 1 (1981). The requirements for a valid contract include, *inter alia*, an offer and an acceptance of that offer. *Klein v. Weiss*, 284 Md. 36, 63, 395 A.2d 126 (1978). The offer and acceptance are collectively referred to as mutual assent. *Id.* In an auction setting, the point at which mutual assent is achieved depends on the type of auction being held.

▮▮▮▮ There are generally two methods to sell property at an auction; either "with reserve" or "without reserve." 1 Arthur L. Corbin, *Corbin on Contracts* § 4.14 (Rev. ed. 1993); 7 Am.Jur.2d *Auction and Auctioneers* § 17 (1980). The presumption in contract law is that auctions are held "with reserve" unless otherwise specified. 1 Corbin § 4.14; 7 Am. Jur.2d § 17; Md.Code (1957, 1992 Repl.Vol.), § 2–328(3) of the Com.Law Art (CL).[6] In an auction held "with reserve," an

---

6. Md.Code, CL § 2–328 (also known as the Maryland Uniform Commercial Code), reads, in part:

(2) A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner. . . .

(3) Such sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve the auctioneer may withdraw the goods at any time until he announces completion of the sale. In an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within the auctioneer's announcement of completion of the sale, but a bidder's retraction does not revive any previous bid.

(4) If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale. . . .

Md.Code, CL § 2–328, and the corresponding Uniform Commercial Code section, are consistent with accepted legal principles of an auction sale. *See also* Uniform Land Transaction Act § 2–207 (1977) (adopting the UCC guidelines for auction sales). The Maryland Uniform Com-

auctioneer's bringing a piece of property up for bid is *an invitation to make a contract,* and is not an offer to contract. 7 Am.Jur.2d § 17; *see Ferrero Constr. v. Dennis Rourke Corp.,* 311 Md. 560, 578, 536 A.2d 1137 (1988) (stating that in contract law an invitation to submit an offer is not itself an offer). One of the distinguishing features of an auction held "with reserve" is that the owner reserves the right not to sell the property, and can withdraw the property from the auction before the acceptance of the highest bid. 1 Corbin § 4.14, at 638; 7 Am.Jur.2d § 17.

■ Conversely, in an auction held "without reserve," *the opening of bids by the auctioneer constitutes a firm offer,* as opposed to an invitation to make an offer. 7 Am.Jur.2d § 17. In this type of auction the seller promises to sell the goods to the highest bidder. 1 Corbin § 4.14, at 642; 7 Am.Jur.2d § 17. The Restatement (Second) describes an auction "without reserve" as:

> [W]hen goods are put up without reserve, the auctioneer makes an offer to sell at any price bid by the highest bidder, and after the auctioneer calls for bids the goods cannot be withdrawn unless no bid is made within a reasonable time. . . .

Restatement (Second) § 28(1)(b), at 79–80 (1979).

■ Therefore, in an absolute auction, or an auction held without reserve, mutual contingent assent is achieved when an offer is made. Each bid made is a mutual assent between the seller and the respective bidder, contingent only on no higher bid being received. As each high bid is made, the previous contract is extinguished and a new contract based on mutual contingent assent comes into being. At the point when no further bids are made, the contingency in the last bid made is extinguished and a final contract in the series of contingent contracts is established.

---

mercial Code, however, is not directly applicable in this case because it only applies to the sale of goods. Md.Code, CL § 2–102.

■ An additional characteristic of an auction held "without reserve" is that the seller of a piece of property cannot bid on that piece of property when it is subject to sale. 7 Am.Jur.2d § 19; *see* Md.Code, CL § 2–328(4). This rule helps ensure that the mutual assent that is necessary for a contractual relationship at an auction remains unaltered.

At an auction held "without reserve," if a seller were allowed to bid on the property, the auctioneer's request for bids would no longer constitute a bona fide offer. For example, the owner could choose to out-bid a competitor, thus, in effect, rejecting the "highest bidder's" acceptance. An owner bidding on his own property would thereby transform an auction held "without reserve" into one held "with reserve." As discussed, *infra*, this transformation can only be done with sufficient notice to the participants.

In the case *sub judice*, the distinction between an auction held "with reserve" and "without reserve" is a bit obscured. The lots were sold pursuant to the Bidder's Choice method, with the caveat that two lots were sold "absolute," and that it was left to Pyles and Reed's discretion to choose which two bids they had to accept. The other nine lots were sold "with reserve." In order to comply with the terms of the auction contained in the advertisement, Pyles and Reed had to follow the rules governing an auction held "without reserve."

### B.

■ Pyles and Reed's joint ownership argument is an end run around the prohibition of owners bidding in a "without reserve" auction. The rule preventing owners from bidding at an auction held "without reserve," contrary to Pyles's and Reed's insistence, extends to joint owners of property and owners of property as tenants in common.

There is no established case law or authority that supports Pyles's and Reed's position. 7 Am.Jur.2d § 19 (stating that the main consideration with "joint owner bidding" is who is in control of the auction); *see* Md.Code, CL § 2–328 (not excepting joint owners from the rule against owners bidding on their

own property at an auction held "without reserve"). This lack of case law exists for a good reason; joint ownership lacks any distinguishing characteristic that would require the rules of an auction to differentiate between the analogous ownership interests of owners and joint owners.

The definitions of these two terms illustrates their comparable features. An owner is defined as, *inter alia,* "[t]he person in whom is vested the ... title of property." *Black's Law Dictionary* 1105 (6th ed. 1990). A joint owner, which includes owners as tenants in common, is defined as, *inter alia,* "[t]wo or more persons who jointly own and hold title to property...." *Id.* at 1106.

A joint owner, even if bidding as an individual, still has an ownership interest in the property. Pyles or Reed could have sold their interest in Parlett and could have used their interest in Parlett as collateral for a loan. Joint owners bidding in a "without reserve auction" would thereby have the same adverse effect on mutual assent as single owners and, in effect, transform a "without reserve" auction into a "with reserve" auction.[7] There are, however, specific rules for converting an

---

7. This rule is not intended to close the door on situations in which individuals who were members of a dissolved partnership or corporation that is selling off its assets would be able to bid on those assets as individuals. Individuals of a dissolved partnership or corporation for the most part are not considered the owners of the dissolved entity's assets. The National Auctioneers Association made a similar distinction when it stated that its provision did not prevent

   [a]ny individual party to the dissolution of any marriage, partnership, or corporation from bidding as an individual entity apart from the selling entity, on goods being sold at auction pursuant to that dissolution....

   We agree that the general rule prohibiting a joint owner from bidding in an auction held "without reserve" is not intended to foreclose an individual joint owner from bidding in a judicially sanctioned sale such as a sale of real property owned by a husband and wife and sold in the divorce proceedings, or sale in lieu of partition conducted pursuant to Md.Code (1996 Repl.Vol.), § 14–107 of the Real Property Article. Individual joint owners bidding in a section 14–107 partition sale do not interfere with the mutual assent that is necessary for the contractual relationship because a trustee oversees the auction. *See Kline v. Kline,* 93 Md.App. 696, 703, 614 A.2d 984 (1992) (stating that the trustee's duty is to protect the rights of the parties); *Lentz v. Dypsky,* 49 Md.App.

auction held "without reserve" into an auction held "with reserve."

## II.

Pyles and Reed next argue that they were allowed to participate in the auction because Goller had notice that they were going to bid. Goller, in turn, maintains that he did not have sufficient notice of Pyles and Reed's interest in bidding at the auction.

■ The terms of an auction can be established by the advertisements or other publications released by the sellers. Restatement (Second) § 28(2); 7 Am.Jur.2d §§ 14 & 17; *cf. Erie Coal & Coke Corp. v. United States,* 266 U.S. 518, 520, 45 S.Ct. 181, 181–82, 69 L.Ed. 417 (1925) (holding that conditions of a sale set in an advertisement were binding). These terms are binding unless modified or changed prior to the start of the auction. Restatement (Second) § 28(1); 7 Am.Jur.2d § 14; *see Sullivan v. Mosner,* 266 Md. 479, 491, 295 A.2d 482 (1972) (stating that a written agreement may be modified by a subsequent oral modification). The Restatement (Second) dictates that:

> Unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, posting or other publication of which bidders are or should be aware, as modified by any announcement made by the auctioneer when the goods are put up.

Restatement (Second) § 28(2).

■ In this case, Fitzgerald's pre-auction announcement was consistent with the printed terms of the pamphlet and the advertisements.

---

97, 103, 430 A.2d 109 (1981). The trustee's involvement in the partition sale insulates the contractual process from the tarnish of having an owner involved in both the offer and acceptance components of mutual assent. The guidelines of a partition sale may prohibit a joint owner from bidding, but this prohibition is not legally mandated, as with nonjudicial auctions held "without reserve."

The closest the Maryland courts have come to commenting on the oral modification of the printed terms of an auction came in *Lewis v. E.F. Schlichter Co.*, 137 Md. 217, 112 A. 282 (1920). In *Lewis*, the Court of Appeals held that an auctioneer's public statement before the start of the auction was binding on the parties because it clarified the terms of the advertisement. The Court of Appeals discussed the rule against orally modifying the terms of an auction, but it avoided deciding whether it applied in Maryland by holding that the auctioneer's statement supplemented the printed materials. *Id.* at 225, 112 A. 282. Thus, it left this question unanswered.[8]

■■■ There is little dispute that advertised terms of an auction can be orally modified. These changes, however, must be announced by the auctioneer in the form of a public statement so that all the bidders know of, or should have known of, the changes in the auction. Restatement (Second) § 28(2); 7 Am.Jur.2d § 14; *see Nicholson v. Clark*, 802 S.W.2d 934, 938 (Ky.Ct.App.1990), *cert. denied* 802 S.W.2d 934 (Ky.1991) (noting that at an auction held "without reserve," a seller was not allowed to bid because there was no public announcement to that effect). A public announcement requirement helps ensure that all bidders "stand on equal footing" with respect to the auction. 7 Am.Jur.2d § 19, at 374. In this case, however, there was no announcement that could constitute a modification of the published terms of the auction.

Fitzgerald testified that there was no public announcement indicating that Pyles and Reed were going to bid on the property. Pyles and Reed told Fitzgerald that they were thinking about bidding on the property when it became apparent that only two people had registered for the auction. Even though Fitzgerald knew that this was generally not allowed, he told Goller, in a private conversation, that the owners were thinking about bidding on property. Thus, the vague private

---

**8.** In 7 Am.Jur.2d § 15, n. 31, the treatise mistakenly cites to *Lewis* to illustrate a case that differs from the accepted principle that the terms of an auction can be orally modified.

conversation between Goller and Fitzgerald was not sufficient notice as to constitute an oral modification of the printed advertised terms of the auction.[9]

## III.

Pyles and Reed insist that the trial court erred in issuing its order for specific performance because the statute of frauds

---

**9.** The prohibition against allowing joint owners to bid on their own property at a "without reserve" auction and the rule requiring any changes in the auction's terms to be in the form of a public statement are consistent with the general tenets of the "school of law and economics." Judge Richard Posner, for example, believes that laws should promote efficiency in society and the marketplace, thereby encouraging the maximization of wealth in society. Richard A. Posner, *Economic Analysis of the Law* 1-13 (4th ed. 1991). The common law, which serves as the foundation for the contract law that governs auctions, can be "best (not perfectly) explained as a system for maximizing the wealth of society." *Id.* at 23. With respect to the sale of property, under "the law and economics" approach, society, and its laws, should strive to encourage efficient transfers of property.

Allowing joint owners to bid at a "without reserve" auction without giving proper notice to the other participants, however, discourages this efficiency goal. First, unauthorized bidding by owners promotes fraud and opportunism. This fraud and opportunism manifest themselves in the form of owners bidding at the auction with no other purpose than to increase the price. This form of "puffing" or artificial price increase has a negative impact on the market place by distorting land prices. *See Id.* at 91 (stating that "the fundamental function of contract law ... is to deter people from behaving opportunistically toward their contracting parties, in order to encourage the optimal timing of economic activity and (the same point) obviate costly self-protective measures").

Second, allowing unauthorized ownership bidding may actually discourage people from attending "without reserve" auctions. This would, in turn, hinder owners, who genuinely want to dispose of their property by means of an auction held "without reserve," from being able to sell their land.

Finally, Posner argues that contracts should not be enforced when the costs of enforcing the contract outweigh the overall benefit to society because enforcement would promote economic inefficiency. *See* Anthony T. Kronman and Richard A. Posner, *The Economics of Contract Law* 48–49 (1979) (reprinted by permission, from 6 J. Legal Studies 411 (1977)). In this case, enforcing the rule prohibiting Pyles and Reed from bidding does not seem to require a disproportionate allocation of resources. For example, it could be argued that the economic benefits of promoting the sale of lot No. 7 to Goller, which include deterring fraud, outweigh the minimal administrative costs associated with enforcing the circuit court's specific performance order.

bars Goller's action. Goller counters that the statute of frauds is not a bar in this case.

■ Even though there was no written agreement between Goller and Reed and Pyles, Goller's claim is not barred by the statute of frauds. The statute of frauds requires that:

No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him.

Md.Code (1957, 1996 Repl.Vol.), § 5–104 of the Real Prop. Art. The statute of frauds is applicable to the sale of land. *Singstack v. Harding*, 4 H. & J. 186, 190–191 (1886).

The statute of frauds argument advanced by Pyles and Reed ignores the contractual significance of an auction held "without reserve." As discussed *supra*, in an auction held "without reserve," mutual assents are achieved in succession as each next high bid is made, and final mutual assent and a final enforceable contract comes into existence when the last high bid is made. Once final mutual assent is achieved, the statute of frauds merely requires that the parties sign a memorandum encompassing all the elements of a contract.

■ In this case, Goller never had an opportunity to sign a memorandum because Pyles and Reed rejected his bid. It would fly in the face of common sense to hold that Goller is precluded from specific performance of the sale of lot No. 7 because of Pyles's and Reed's unlawful rejection of his bid. The circuit court, thereby, correctly ordered Pyles and Reed to "execute any and all instruments necessary to convey the property to him [Goller] for the amount that he bid, $25,-000...."

"Equity regards that as done which ought to be done." *Blum v. Fox*, 173 Md. 527, 537, 197 A. 117 (1938). Pursuant to the circuit court's order and general principles of equity, Pyles and Reed must sign a memorandum conveying title to Goller

in exchange for $25,000. If they refuse to comply with this order, the circuit court may appoint a trustee to sign a contract on behalf of Pyles and Reed so as to certify the conveyance. *See* Md.Rule 2–648 (stating, in part, "[W]hen a person fails to comply with a judgment mandating action, the court may direct that the act be performed by some other person appointed by the court...."); *Commercial & Ind. Prop., Inc. v. Anello,* 36 Md.App. 191, 194, 373 A.2d 82 (1977) (authorizing the appointment of a trustee in order to comply with an order for specific performance).

JUDGMENT AFFIRMED. APPELLANTS TO PAY COSTS.