61 A.3d 817

Gladys GARDNER, Individually and on behalf
of All Persons Similarly Situated

v.

ALLY FINANCIAL INCORPORATED,
f/k/a GMAC Incorporated

and

Randolph Scott, Individually and on behalf
of All Persons Similarly Situated

v.

Nuvell National Auto Finance, LLC, d/b/a Nuvell National
Auto Finance; Nuvell Financial Services LLC.

Misc. Docket No. 10, Sept. Term, 2012.

Court of Appeals of Maryland.

March 1, 2013.

Benjamin H. Carney, (Martin E. Wolf of Gordon & Wolf, Chtd., Baltimore, MD; Mark H. Steinbach of O'Toole, Rothwell, Nassau & Steinbach, Washington, D.C.; John J. Roddy and Elizabeth A. Ryan of Bailey & Glasser LLP, Boston, Massachusetts), on brief, for Appellants.

Andrew S. Doctoroff, (Jason R. Abel of Honigman Miller Schwartz and Cohn LLP, Detroit, Michigan; Kimberly A. Manuelides and Geoffrey M. Gamble of Saul Ewing LLP, Baltimore, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

We have before us a question of law, certified by the United States Court of Appeals for the Fourth Circuit, pursuant to the Maryland Uniform Certification of Questions of Law Act, Sections 12–601 to 12–613 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.)[1] and Rule

---

1. Section 12–603 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.) provides:

   The Court of Appeals of this State may answer a question of law certified to it by a court of the United States or by an appellate court of another state or of a tribe, if the answer may be determinative of an issue in pending litigation in the certifying court and there is no

8–305,[2] regarding whether auctions of two repossessed automobiles, which were characterized by the creditors as "public auctions," were in actuality "private sales," under the provisions of the Creditor Grantor Closed End Credit Act, Section 12–1021(j) of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.) ("CLEC"),[3] because attendance was

---

controlling appellate decision, constitutional provision, or statute of this State.

**2.** Rule 8–305 provides:

(a) **Certifying court.** "Certifying court" as used in this Rule means a court authorized by Code, Courts Article, § 12–603 to certify a question of law to the Court of Appeals of Maryland.

(b) **Certification order.** In disposing of an action pending before it, a certifying court, on motion of any party or on its own initiative, may submit to the Court of Appeals a question of law of this State, in accordance with the Maryland Uniform Certification of Questions of Law Act, by filing a certification order. The certification order shall be signed by a judge of the certifying court and state the question of law submitted, the relevant facts from which the question arises, and the party who shall be treated as the appellant in the certification procedure. The original order and seven copies shall be forwarded to the Court of Appeals by the clerk of the certifying court under its official seal, together with the filing fee for docketing regular appeals, payable to the Clerk of the Court of Appeals.

(c) **Proceeding in the Court of Appeals.** The filing of the certification order in the Court of Appeals shall be the equivalent of the transmission of a record on appeal. The Court of Appeals may request, in addition, all or any part of the record before the certifying court. Upon request, the certifying court shall file the original or a copy of the parts of the record requested together with a certificate, under the official seal of the certifying court and signed by a judge or clerk of that court, stating that the materials submitted are all the parts of the record requested by the Court of Appeals.

(d) **Decision by the Court of Appeals.** The written opinion of the Court of Appeals stating the law governing the question certified shall be sent by the Clerk of the Court of Appeals to the certifying court. The Clerk of the Court of Appeals shall certify, under seal of the Court, that the opinion is in response to the question of law of this State submitted by the certifying court.

**3.** Section 12–1021(j) of the Commercial Article, pertaining to sales of repossessed personal property under CLEC, provides:

(j) *Sale or auction—Authorized; notice; commercially reasonable manner; accounting.*—(1)(i) Subject to subsection (*l*) of this section, the credit grantor shall sell the property that was repossessed at:
1. Subject to paragraph (2) of this subsection, a private sale; or A public auction.

limited to those who paid a refundable $1,000 cash deposit, even to observe:

> Where tangible personal property financed pursuant to Maryland's Creditor Grantor Closed End Credit Act ("CLEC"), Md. Code Ann., Com. Law §§ 12–1001 *et seq.*, is subsequently repossessed and sold by the credit grantor at an auction that is publicly advertised but requires a $1,000 refundable fee for a person to enter and observe the auction, regardless of whether the person intends to bid, is the sale a private sale under CLEC, and thus subject to the post-sale disclosure requirements in Md. Code Ann., Com. Law § 12–1021(j)(2), or is it a "public auction" (or "public

---

(ii) At least 10 days before the sale, the credit grantor shall notify the consumer borrower in writing of the time and place of the sale, by certified mail, return receipt requested, sent to the consumer borrower's last known address.

(iii) Any sale of repossessed property must be accomplished in a commercially reasonable manner.

(2) In all cases of a private sale of repossessed goods under this section, a full accounting shall be made to the borrower in writing and the seller shall retain a copy of this accounting for at least 24 months. This accounting shall contain the following information:

(i) The unpaid balance at the time the goods were repossessed;

(ii) The refund credit of unearned finance charges and insurance premiums, if any;

(iii) The remaining net balance;

(iv) The proceeds of the sale of the goods;

(v) The remaining deficiency balance, if any, or the amount due the buyer;

(vi) All expenses incurred as a result of the sale;

(vii) The purchaser's name, address, and business address;

(viii) The number of bids sought and received; and

(ix) Any statement as to the condition of the goods at the time of repossession which would cause their value to be increased or decreased above or below the market value for goods of like kind and quality.

(3) The Commissioner of Financial Regulation may make a determination concerning any private sale that the sale was not accomplished in a commercially reasonable manner. Upon that determination, the Commissioner may enter an order disallowing any claim for a deficiency balance.

Unless otherwise stated, all subsequent statutory references are to the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.).

sale"), [2] subject instead to the requirements of § 12–1021(k)?

> 2  Section 12–1021 appears to use the terms "public auction" and "public sale" interchangeably. *Compare* Md.Code Ann., Com. Law § 12–1021(j)(1)(i) (using "public auction") *with* § 12–1021(k)(1) (using "public sale"). Neither term is defined in CLEC, nor is the term "private sale."

For the reasons that follow, we conclude that the auctions at issue were "private sales" under CLEC, Section 12–1021(j).

In its Certification Order, the Fourth Circuit summarized the circumstances giving rise to the question, involving defaults by Gladys Gardner and Randolph Scott on their respective automotive loan agreements and the subsequent repossessions of their cars by Ally Financial Inc., Nuvell National Auto Finance LLC, and Nuvell Financial Services LLC (collectively "GMAC"): [4]

> The relevant and undisputed facts as recited by the district court and set forth in the Appellants' complaints are as follows.[3] *See Scott v. Nuvell Fin. Servs.,* 789 F.Supp.2d 637 (D.Md.2011); Scott Am. Compl. (J.A. 20–41); Gardner Am. Compl. (J.A. 81–103).[4]

> 3  Both of these complaints were styled as putative class actions; however, the district court ruled on GMAC's summary judgment motion before a class was certified.

> 4  Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

In 2007, Scott purchased a 2007 Mitsubishi Galant under a retail installment sales contract governed by the provisions of the CLEC. His contract was assigned to GMAC. Scott subsequently defaulted on the loan, and GMAC repossessed the vehicle on February 22, 2009. On March 17, 2009, GMAC sent a notice to Scott, informing him that the Galant would be sold at a "public sale" conducted by Manheim of Baltimore–Washington ("Manheim") [5] on Tuesday,

---

**4.**  Ally Financial Inc. was formerly known as GMAC, and Nuvell National Auto Finance LLC and Nuvell Financial Services LLC are wholly owned subsidiaries of GMAC.

**5.**  Following oral argument in this Court, Manheim of Baltimore–Washington, which is not a party to this action, submitted a pleading. We

March 31, 2009. GMAC then sent Scott a notice on a form indicating that his car had been sold at that auction, and explaining that an approximate balance of $16,541 remained. *See Scott,* 789 F.Supp.2d at 638–39; Scott Am. Compl. ¶¶ 12–13, 15–18, 26.

In July 2006, Gardner likewise purchased a Chevrolet Impala under a retail installment sales contract governed by the provisions of the CLEC. Gardner failed to make scheduled payments on the vehicle, and GMAC, who was assigned the contract and a security interest in the vehicle, repossessed it. On December 8, 2009, GMAC sent a notice to Gardner, notifying her that the Impala would be sold at a public sale on Tuesday, January 5, 2010, as part of another Manheim auction. The notice stated, "[Y]ou may attend the sale and bring bidders if you want." *Scott,* 789 F.Supp.2d at 639; Gardner Compl. ¶¶ 12–13, 15–17.

Neither Scott's nor Gardner's notices mentioned that members of the public needed to provide a refundable $1,000 cash deposit in order to *attend* the auction.[5] Scott Am. Compl. ¶ 20; Gardner Am. Compl. ¶ 22. In fact, Gardner tried to attend, but she was denied admission because she could not pay the deposit. Gardner Am. Compl. ¶ 26. She stated, "Since I did not find out about the $1,000 entrance fee until I arrived at the auction, I did not even have time to try to get the $1,000 entrance fee to attend the auction." Gardner Aff. ¶ 5 (J.A. 413). After her vehicle was sold at the auction, GMAC informed her of the sale and also that she had a deficiency balance of approximately $12,196. *Scott,* 789 F.Supp.2d at 639; Gardner Compl. ¶ 28.

5 If an attendee does not buy anything at the auction, he or she is refunded the deposit amount via check two days later. If a purchase is made, the deposit is credited toward the purchase price. *See Scott,* 789 F.Supp.2d at 638 n. 1; Gardner Compl. ¶ 19.

The Manheim "Tuesday Sales," including the ones in which Gardner's and Scott's vehicles were sold, were adver-

have not considered it in determining the answer to the Certified Question.

tised every Sunday in the *Baltimore Sun's* classified "auction" section. The ads, printed in a similar font as other ads in that section, provided the time and location of the sale, a contact phone number, and the terms and conditions of the sale, including the requirement of a refundable $1,000 cash deposit to attend. *See Scott,* 789 F.Supp.2d at 643. The ads did not, however, mention the makes or model years of the cars to be sold, nor did they include a specific description of the condition of the cars. *Id.*

Ms. Gardner and Mr. Scott filed separate complaints against GMAC in the United States District Court for the District of Maryland, in which they alleged, in part, that GMAC violated CLEC because the sales of their cars were in reality "private sales," which required GMAC to provide a detailed post-sale disclosure to the debtors under CLEC, Section 12–1021(j)(2) of the Commercial Law Article, which GMAC had not done:

> Scott and Gardner filed suit against GMAC, and they both alleged the same five counts: (1) violation of the CLEC; (2) breach of contract; (3) declaratory and injunctive relief; (4) restitution and unjust enrichment; and (5) violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13–101 *et seq.* Their suits were combined, as they were "nearly identical in all material respects." *Scott,* 789 F.Supp.2d at 639. Notably, "both suits are [ ] predicated on the factual premise that the Tuesday [Sales] were private sales subject to more stringent notice and accounting requirements." *Id.*[6]

6  On August 24, 2010, GMAC filed a third-party complaint against Manheim Marketing, Inc., a company with which GMAC contracted to conduct auctions of its repossessed automobiles. *See* J.A. 115–121. However, GMAC filed a Notice of Dismissal Without Prejudice as to Manheim on November 18, 2010, and the district court approved the dismissal the same day. As a result, Manheim did not participate in this appeal.

The District Court combined the two cases because they shared the same issue: whether the sale of the debtor's car was a "public auction" or a "private sale" under CLEC. GMAC filed a motion for summary judgment, which the Court granted, concluding that the sales were "public auctions"

because they "were both widely advertised and open to the public for competitive bidding." *Scott v. Nuvell Financial Services LLC,* 789 F.Supp.2d 637, 644 (D.Md.2011).

Ms. Gardner and Mr. Scott appealed. Before the Fourth Circuit, they filed a motion to certify questions of law to this Court, as to whether the sales of their cars were "private sales" because of the $1,000 admission fee required to attend and observe. The Fourth Circuit initially denied the motion, but thereafter, *sua sponte,* certified the issue:

> After discovery had begun, the district court *sua sponte* raised the question of whether the Tuesday Sales were actually "public sales" under Maryland law, and invited the parties to move for judgment on the pleadings on this issue. Thereafter, the Appellees filed a motion for summary judgment, which the court granted as to all five counts. *See Scott,* 789 F.Supp.2d at 645. The court also rejected a request by Scott and Gardner to pursue further discovery on the issue before ruling. *See id.* at 640–42.

> Upon appeal to this court, the Appellants filed a Motion to Certify Questions of Law to the Court of Appeals of Maryland on October 6, 2011. This court denied the motion on November 14, 2011. Here, however, we address the certification motion *sua sponte.*

The issue before us is limited to the $1,000 admission fee and its impact on the characterization of sales of repossessed cars as "public" versus "private." [6] The admission fee in issue must be differentiated from other financial mechanisms employed by auctioneers that are not addressed herein, such as a bidder's fee, which is a deposit charged to an auction attendee who intends to bid and is later refunded to an unsuccessful bidder, *Pyles v. Goller,* 109 Md.App. 71, 76, 674 A.2d 35, 37–38 (1996) (involving a $5,000 deposit in order to bid during a public sale); an entry cost, which is "a nonrefundable fee required from bidders," Ronald N. Johnson, "Auction

---

[6]. As the Certified Question asks us to the consider the impact of an admission fee under CLEC, we do not address the parties' arguments regarding the sufficiency of the notice sent by GMAC to the debtors.

Markets, Bid Preparation Costs and Entrance Fees," 55 Land Economics 313, 313, 316 (1979); and a reserve price, which is defined as "[t]he minimum price that a seller is willing to accept for a property to be sold at auction," National Auctioneers Association, *Glossary of Terms,* http://www.auctioneers. org/glossary (last visited Feb. 27, 2013).

It is axiomatic that "[w]hen a buyer finances the purchase of a car with funds advanced by a creditor, the creditor often retains a security interest in the car as collateral." *Ford Motor Credit Co. v. Roberson,* 420 Md. 649, 656, 25 A.3d 110, 114 (2011). Should the debtor default on the loan, the security interest enables the creditor to repossess and retain the car for full satisfaction of the debt or to sell it at a "public auction" or "private sale" and use the sale's proceeds to decrease the loan obligation of the debtor. Section 12–1021(a), (j)(1), (*l* )(4)(i). The sale, whether a "public auction" or a "private sale," "must be accomplished in a commercially reasonable manner." Section 12–1021(j)(2)(iii).

If the sale is a "public auction," and the loan secured was more than $2,000, the debtor, after the sale, must receive a written statement detailing how the proceeds were allocated among the costs of the auction, costs of storing the collateral, and reducing the debt obligation:

(k) *Same—Disposition of certain proceeds.*—(1) The provisions of this subsection apply to a public sale of property which secured a loan in excess of $ 2,000 at the time the loan was made.

(2) The proceeds of a sale to which this subsection applies shall be applied, in the following order, to:

(i) The actual and reasonable cost of the sale;

(ii) The actual and reasonable cost of retaking and storing the property; and

(iii) The unpaid balance owing under the agreement at the time the property was repossessed.

(3) The credit grantor shall furnish to the consumer borrower a written statement which shows the distribution of the proceeds.

Section 12–1021(k).

If the sale is a "private sale," by contrast, the debtor must receive more detailed information, both quantitatively and qualitatively, in the form of a post-sale disclosure. This post-sale disclosure includes, in addition to a description of the distribution of the proceeds, information about the purchaser, the number of bids received, and, if there is an impact on its value, the condition of the collateral at the time it was repossessed:

(2) In all cases of a private sale of repossessed goods under this section, a full accounting shall be made to the borrower in writing and the seller shall retain a copy of this accounting for at least 24 months. This accounting shall contain the following information:

(i) The unpaid balance at the time the goods were repossessed;

(ii) The refund credit of unearned finance charges and insurance premiums, if any;

(iii) The remaining net balance;

(iv) The proceeds of the sale of the goods;

(v) The remaining deficiency balance, if any, or the amount due the buyer;

(vi) All expenses incurred as a result of the sale;

(vii) The purchaser's name, address, and business address;

(viii) The number of bids sought and received; and

(ix) Any statement as to the condition of the goods at the time of repossession which would cause their value to be increased or decreased above or below the market value for goods of like kind and quality.

Section 12–1021(j)(2).

After the sale, the creditor may pursue a deficiency judgment against the debtor for the remaining balance of the loan.

The debtor, obviously, only can challenge a creditor's sale as violative of CLEC after it is completed, typically in defense of a deficiency proceeding. If the debtor can show that the creditor failed to abide by the requirements of CLEC in selling the collateral, the creditor may be barred from a deficiency judgment and limited to the proceeds of the sale as satisfaction of the debt. Section 12–1021(j)(3), (k)(iv).

The debtors in this case contend that the sales of their cars were private, because the $1,000 admission fee restricted access to the sales, and therefore GMAC should have furnished to them the post-sale disclosures required for "private sales." They construe the different post-sale disclosure requirements, which compel the production of more information to the debtor if the sale is a "private sale," as evidence that the distinction between the two types of sales is the debtor's ability to attend.

GMAC counters that it was not required to provide detailed post-sale disclosures to the debtors because the sales were "public auctions." It argues that a "private sale" is one that expressly excludes "classes of individuals" and defines a "public auction" as "a method of selling [property] in a public forum through open and competitive bidding," quoting *Pyles*, 109 Md.App. at 75 n. 2, 674 A.2d at 37 n. 2. It argues that a "public auction" does not mandate the attendance of the debtor, but, instead, the distinction between sales in a public or private context is the presence of competitive bidding. The admission fee, GMAC further maintains, improved competitive bidding because the fee ensured that potential bidders would be able to pay at least $1,000 toward the price of the cars.

CLEC does not define "public auction" or "private sale," nor does the Uniform Commercial Code [7] or other provisions in

---

7. The following provisions of the Maryland Uniform Commercial Code involving a "public sale" and a "private sale," for example, do not define the public-private distinction: Section 2–706 of the Commercial Law Article (regarding the seller's resale of goods as a remedy to the buyer's breach); Section 7–206 of the Commercial Law Article (providing that a warehouse may sell goods "at public or private sale," if the

which the terms are used.[8] Legislative history, then, becomes important: CLEC was enacted in 1984 as part of a body of legislation "to entice creditors to do business in the State...." *Roberson,* 420 Md. 649, 662, 25 A.3d 110, 118 (2011). CLEC was designed, in part, to counter "more favorable" regulations in Delaware that had attracted lenders to that state away from Maryland, causing significant job loss in the Baltimore area. *Biggus v. Ford Motor Credit Co.,* 328 Md. 188, 197, 613 A.2d 986, 991 (1992). This 1983 Act, however, enabled a creditor only to sell repossessed goods at a "public auction." 1983 Maryland Laws, Chapter 143.

In 1987, Chapter 765 of the Laws of Maryland, which originated as Senate Bill 839, amended CLEC, to add "private sale" as an alternative to a "public auction."[9] Senate Bill 839, sponsored by Senator George Della, added the opportunity for a creditor to sell collateral by "private sale,"[10] in addition to

---

goods are a hazard to other property, facilities, or other persons); Section 7–210 of the Commercial Law Article (providing for the enforcement of a warehouse lien by public or private sale); Section 7–308 of the Commercial Law Article (providing for the enforcement of a carrier's lien on goods by public or private sale); Section 9–614 of the Commercial Law Article (providing Safe–Harbor forms of pre-sale notification of public and private sales).

8. Other statutes providing for the sale of repossessed collateral by public or private sale include: the Interest and Usury statute, Section 12–115(j), the Retail Installment Sales Act (RISA), Section 12–626(e)(1)(ii), and the Credit Grantor Revolving Credit Provisions, Section 12–921(j).

9. In Chapter 765 of the Laws of Maryland of 1983, in addition to CLEC, two other statutes in the Commercial Law Article were amended as well: the Interest and Usury statute, codified at Section 12–115(j), and the Credit Grantor Revolving Credit Provisions, codified at Section 12–921(j).

10. The option of a "private sale," according to Senator Della, was being proposed to enable the creditor to sell to those who would purchase the property for personal use, as opposed to a buyer who would purchase the property at a lower price, so to then resell it for a profit, such as a wholesaler. The bill file for Senate Bill 839 (1987) includes a handwritten Hearing Summary of the House Committee on Economic Matters Hearing, noting that Senator Della testified that the "Ave citizen cannot attend [struck word] auctions—often only dlrs. bid on vehicles, thus

"public auction," and further provided that "any sale of repossessed property must be accomplished in a commercially reasonable manner." Although the bill failed to identify what a "commercially reasonable manner" would constitute, the bill file does contain a letter from Attorney General J. Joseph Curran, Jr. to Governor William D. Schaefer regarding the constitutionality and legal sufficiency of the bill, in which the Attorney General opined that the concept of commercial reasonableness manifested itself in the common law, citing our decision in *Obrecht v. Crawford*, 175 Md. 385, 2 A.2d 1 (1938), which involved a seller's resale of flour following the buyer's breach of contract. There, we explained, and the Attorney General quoted in his letter, "where [the seller] elects to resell, he must do [so] within a reasonable time and in such a manner as to secure the best obtainable price and he is bound to exercise reasonable care and diligence to that end." *Obrecht*, 175 Md. at 397–98, 2 A.2d at 8 (citation omitted). Beyond referencing this duty of reasonable care, the legislative history regarding commercial reasonableness is wanting.

The bill file additionally contains a memorandum addressed to the House Economic Matters Committee Counsel from Delegate Dana Dembrow, expressing concern that a "private sale" could enable the creditor to engage in a sale of the debtor's property, collusive in nature, which would result in a rock-bottom resale price and a deficiency against the debtor for the entire loan:

---

forcing down the price...." The bill file also contains an untitled explanation, which was characterized in *Kline v. Central Motors Dodge, Inc.*, 328 Md. 448, 457, 614 A.2d 1313, 1317 (1992) as a "senate committee staff report," which described the purpose of the "private sale" option as to enable the creditor to "attract buyers who are purchasing items for personal use and are therefore willing to pay a more reasonable price":

Currently, public sales often do not offer a lender the best advantage of obtaining the best resale price on repossessed goods, as often buyers are unable to attend, or are buying goods at wholesale for later retail resale. By permitting private sale, a lender will be better able to attract buyers who are purchasing items for personal use and are therefore willing to pay a more reasonable price.

Because there is no *notice* provision and no *right of public participation* in this bill which specifically permits private sales of repossessed property, a dealer who repossesses could sell to itself any vehicle for the sum of $1.00 and then proceed against the purchaser for the entire deficiency of the loan (less ($1.00)[) ]. The only possible protection is found in notification of such a sale to the borrower and to the Commissioner of Consumer Credit, but the disclosed activity would be perfectly legal and the deficiency judgement enforceable.

Memorandum from Delegate Dana Dembrow to the House Economic Matters Committee Counsel, Lars Kristiansen (April 9, 1987) (emphasis in original).

Senate Bill 839 was amended in committee to add the post-sale disclosure requirements for "private sales" as part of "consumer protection measures" to "prevent private sales that are made to the detriment of the defaulting buyer/borrower":

The intent is to provide a lender the freedom to seek the best resale price on the repossessed goods, an option that could be of benefit to the defaulting buyer/borrower. Currently, many public sales (auctions) cannot be attended by private buyers due to limitations on how the purchase price must be paid, eligibility to bid and other restructive [*sic* ] factors. Under certain circumstances, such sales do not generate the best possible price as the successful bidder is usually purchasing the goods at wholesale for later retail resale. Certain private purchasers may be interested in buying the goods for their own use and not concerned with the profit motive.

These facts are recognized under the Retail Installment Sales Act (CLA Title 12 subtitle 6); however, to prevent favored buyer private sales that are not "bona fide" (commercially reasonable), the Commissioner of Consumer Credit has a regulation that allows a full review of all private sale transactions under the subtitle. These amendments, if accepted, will codify the pertinent consumer protection measures of that regulation and prevent private sales that are made to the detriment of the defaulting buyer/borrower.

Explanation of Amendments, SB 839 (Senator Della) (1987). The 1987 amendments to CLEC, thus, were intended to balance giving the creditor the benefit of the "freedom to seek the best resale price on the repossessed goods," with protecting the debtor against collusive and detrimental "favored buyer private sales that are not . . . commercially reasonable." *Id.*

The requirements of commercial reasonableness of all sales and post-sale disclosure for a "private sale" have not been materially changed [11] since 1987 nor defined. Nevertheless, we can glean what the concept of "commercial reasonableness" represents by explaining its meaning in the context of Maryland Uniform Commercial Code, pursuant to which the approach is a multi-factor analysis. The outcome of this multi-factor analysis does not necessarily depend solely on a low sales price, as "[t]he fact that a greater amount could have been obtained by a . . . disposition . . . at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner." Section 9–627(a) of the Commercial Law Article.

Rather, " 'the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale.' " *National Housing Partnership v. Municipal Capital Appreciation Partners I, L.P.,*

---

**11.** The Legislature has modified the post-sale disclosure requirements for a "private sale," Section 12–1021(j), several times since 1987; none of these changes is pertinent to our decision. *See* 1988 Md. Laws, Chap. 632 (providing that the "purchaser's name, address, and business" must be filed with the Commissioner of Consumer Credit, who "may provide that information to the borrower where it is necessary to ascertain" that the sale was commercially reasonable and that "any alleged deficiency balance due the seller is, in fact, due"); 1992 Md. Laws, Chap. 22 (Annual Corrective Bill); 1996 Md. Laws, Chap. 326 (changing "Commissioner of Consumer Credit" to "Commissioner of Financial Regulation"); 1997 Md. Laws, Chap. 14 (Annual Corrective Bill); 1997 Md. Laws, Chap. 218 (providing that "the purchaser's name, address, and business" be included in the post-sale disclosure to the debtor).

935 A.2d 300, 315 (D.C.2007), quoting *In re Zsa Zsa, Ltd.,* 352 F.Supp. 665, 671 (S.D.N.Y.1972), *aff'd without opinion,* 475 F.2d 1393 (2d Cir.1973) (emphasis in original). The procedures employed were the focus in *Harris v. Bower,* 266 Md. 579, 590–91, 295 A.2d 870, 875–76 (1972), for example, in which we determined that the creditor's sale of a repossessed boat was not commercially reasonable under the Uniform Commercial Code, because the creditor not only failed to advertise the sale in "customary yachting publications," but also the three bids he received had a "curiously improbable air" about them, and the value of the boat depreciated because the creditor failed to maintain its condition during the two-year delay between the repossession and resale of the boat. Notably, our conclusion was buttressed by the dubious nature of the few prospective offers and the devalued condition of the boat.

Commentators have opined that other procedural aspects that could influence a finding of commercial unreasonableness of a sale are that the sale occurred "too quickly"; that there was inadequate advertising; that it was held in an improper location; that prospective bidders did not have the opportunity to inspect the property before the sale; that the creditor did not perform minor maintenance to the collateral that might increase the selling price; or that the sale did not occur as advertised. James J. White & Robert S. Summers, Uniform Commercial Code 906–08 (5th ed.2000).

The multi-factor analysis used to define commercial reasonableness in the UCC can be applied to CLEC, as we have heretofore noted in *Kline v. Central Motors Dodge, Inc.,* 328 Md. 448, 614 A.2d 1313 (1992), in which we addressed whether the Retail Installment Sales Act ("RISA"), Sections 12–601 to 12–636 of the Commercial Law Article, Maryland Code (1975, 2005 Repl.Vol.), another credit-extension statute, required a "bona fide public or private sale," Section 12–626(e)(1)(ii), to be conducted in a commercially reasonable manner. In concluding that it did, we agreed with the debtors' argument that the phrase "bona fide," in RISA's requirement that a "private sale" must be "bona fide" in accordance with Section 12–626(e)(1)(ii), had "substantially the same meaning as the

words, 'commercially reasonable,' " under what is now Section 9–610(b) of Maryland Uniform Commercial Code. *Kline,* 328 Md. at 451, 459, 614 A.2d at 1314, 1318. We held that "the bona fide sale required by RISA § 12–626 is the same as the commercially reasonable sale required by" CLEC. *Id.* at 459, 614 A.2d at 1318. The phrase "commercially reasonable manner," under CLEC, then, relates to evaluating the procedures utilized to sell collateral.

The post-sale disclosure requirements, similarly, were intended to address the potential for collusion to the detriment of the buyer during a "private sale" and requires greater qualitative and quantitative information be disclosed to the debtor, including: "The purchaser's name, address and business address;" "The number of bids sought and received;" and "Any statement as to the condition of the goods at the time of repossession which would cause their value to be increased or decreased above or below the market value for goods of like kind and quality." Section 12–1021(j)(2)(vii, viii, ix).

Although we have not had occasion to define "public auction," our brethren on the Court of Special Appeals have in *Pyles v. Goller,* 109 Md.App. 71, 75 n. 2, 674 A.2d 35, 37 n. 2 (1996), and *Express Auction Services, Inc. v. Conley,* 127 Md.App. 447, 453, 732 A.2d 1012, 1015 (1999), to be "a method of selling [property] in a public forum through open and competitive bidding," quoting the National Auctioneers Association's *Glossary of Real Estate Auction Terms.* Although both of these cases involved the sale of real estate and neither addressed the issue of whether the sale in question in those cases were "public auctions," it is the definition embraced by GMAC. "Open" and "competitive bidding" are, thus, the gravamen of a "public auction."

To be open, as a deterrent from collusion and abuse, is to be transparent, as we acknowledged most recently in *WSG Holdings, LLC v. Bowie,* 429 Md. 598, 57 A.3d 463 (2012), in which we considered the open meeting provisions of the Charles County Code and the Rules of Procedure of the Board of Appeals for Charles County. In that case, the Board of

Appeals refused to allow all but one member of the public and his counsel to observe an in-person inspection of a subject property in a zoning exception application proceeding. In concluding that this visit was a meeting that was not open, in violation of the Charles County Code and the Board's own Rules of Procedure, we acknowledged that the purpose of openness is to be transparent, to allow the public to observe the Board of Appeals' evidence-gathering and decision-making process, so to prevent corruption, deceit, and "the crystallization of secret decisions to a point just short of ceremonial acceptance." 429 Md. at 619, 57 A.3d at 476, quoting *Town of Palm Beach v. Gradison,* 296 So.2d 473, 477 (Fla.1974). Openness and transparency, then, are dependent on the ability to observe the proceeding to ensure opportunity to observe that rules are being followed and those in control are not engaging in collusive or unfair practices.

In auctions, openness, defined as "full transparency," allows "[b]idders and other interested parties [to] verify that the rules are followed." Peter Cramton & Jesse A. Schwartz, "Collusive Bidding: Lessons from the FCC Spectrum Auctions," 17 Journal of Regulatory Economics 229, 230 (2000). Transparency further assures the integrity of the auction process, as all are involved in observing that the rules of the auction are followed and thereby trust that the sellers are abiding by the rules, as opposed to favoring one bidder.[12] Aleksandar Pekeĉ & Michael H. Rothkopf, "Combinatorial Auction Design," 49 Management Science 1485, 1489 (2003) (*"Transparency* is important in auctions for two reasons: (1) it simplifies bidders' understanding of the situation, thus easing their decision making, and (2) it increases their trust in the auction process by improving their ability to verify that the auction rules have, in fact, been followed." (emphasis in original)). Openness or transparency in a "public auction," thus,

---

12. Counsel for GMAC analogized the $1,000 admission fee to a fee charged to enter a movie house or the Super Bowl, which may be characterized as "open to the public" in spite of a mandatory admission fee. That analogy is not apt in the situation in which openness relates to the integrity of procedures.

elucidates the integrity, or lack thereof, of the procedures employed.

The "public auction" concept, as well as CLEC's language, purpose, and design, thus, define the answer to the Certified Question. A "public auction" requires transparency in the process for its own integrity. The post-sale disclosure requirements for a "private sale" are implicated when openness and transparency are not present, to enable a debtor to challenge the procedures used to sell a vehicle that affect the amount of a deficiency judgment assessed against the debtor.

In the present case, the admission fee obscured transparency because bidders and interested parties would have had to accumulate and part with money, at least temporarily, in order to merely observe the auction. The admission fee shielded the process used to sell Ms. Gardner's and Mr. Scott's cars from observation and, thus, could not constitute a "public auction" under CLEC. Rather, the sales were, in actuality, "private sales" subject to the post-sale disclosure requirements of Section 12–1021(j)(2).

**CERTIFIED QUESTION ANSWERED AS SET FORTH ABOVE. COSTS SHALL BE EQUALLY DIVIDED BETWEEN THE PARTIES.**